# EXHIBIT A

E-FILED
01/10/2025 16:46:51
CL-2025-0000468
Christopher J. Falcon
CLERK, CIRCUIT COURT
FAIRFAX, VA

VIRGINIA:

IN THE CIRCUIT COURT FOR THE COUNTY OF FAIRFAX

FAIRFAX COUNTY WATER AUTHORITY,

Plaintiff,

v.

3M CO., registered agent: Corporation Service Company, 100 Shockoe Slip Fl 2 Richmond, VA 23219;

BUCKEYE FIRE EQUIPMENT CO., 110 Kings Road, Kings Mountain, NC 28086;

AGC CHEMICALS AMERICAS, INC., 55 E. Uwchlan Avenue, Suite 201, Exton, PA 19341;

ARCHROMA U.S., INC., registered agent: C T Corporation System, 4701 Cox Rd, Suite 285, Glen Allen, VA 23060;

ARKEMA, INC., registered agent: Corporation Service Company, 100 Shockoe Slip Fl 2, Richmond, VA 23219;

CHEMICALS INCORPORATED, 12321 Hatcherville Road, Baytown, TX 77521;

CHEMGUARD, INC., One Stanton Street Marinette, WI 54143-2542;

TYCO FIRE PRODUCTS LP, 1400 Pennbrook Pkwy, Lansdale, PA 19446;

BASF CORP., 100 Park Ave, Florham Park, NJ 07932;

Case No.:

Complaint for Abatement & Damages

1) Public Nuisance
2) Private Nuisance
3) Design Defect
4) Failure to Warn
5) Trespass
6) Negligence
7) Tortious Interference with Business Expectancy
8) Civil Conspiracy (Common Law)
9) Civil Conspiracy (Va. Code Ann. §§ 18.2-499, 18.2-500)

-and-

Demand for Jury Trial

**EIDP, INC.,** ***formerly known as*** **E. I. du Pont de Nemours and Company, registered agent: C T Corporation System, 4701 Cox Road, Suite 285, Glen Allen, VA 23060;**

**THE CHEMOURS CO., registered agent: C T Corporation System, 4701 Cox Road, Suite 285, Glen Allen, VA 23060;**

**THE CHEMOURS CO. FC, LLC, registered agent: C T Corporation System, 4701 Cox Road, Suite 285, Glen Allen, VA 23060;**

**CORTEVA, INC., registered agent: C T Corporation System, 4701 Cox Road, Suite 285, Glen Allen, VA 23060;**

**DUPONT DE NEMOURS, INC., 974 Centre Road, Wilmington, DE 19805;**

**CLARIANT CORP., registered agent: Corporation Service Company, 100 Shockoe Slip Fl 2, Richmond, VA 23219;**

**DEEPWATER CHEMICALS, INC., 1210 Airpark Road, Woodward, OK 73801;**

**DYNAX CORP., 79 Westchester Avenue, Pound Ridge, NY 10576;**

**CARRIER FIRE & SECURITY AMERICAS LLC,** ***formerly known as*** **Carrier Fire & Security Americas Corporation, registered agent: United Agent Group Inc., 425 W Washington Street, Suite 4, Suffolk, VA 23434;**

**RTX CORPORATION,** ***formerly known as*** **Raytheon Technologies Corporation, registered agent: C T Corporation System,**

**4701 Cox Road Suite 285, Glen Allen, VA 23060;**

**CARRIER GLOBAL CORPORATION,** ***formerly known as*** **Carrier Solutions Corporation, 13995 Pasteur Boulevard, Palm Beach Gardens, FL 33418;**

**NATION FORD CHEMICAL CO, 2300 Banks Road, Fort Mill, SC 29715;** and

**Does 1-100, inclusive,**

**Defendants.**

Fairfax County Water Authority ("Fairfax Water"), acting by and through undersigned counsel, alleges as follows:

## I. INTRODUCTION

1. Per- and polyfluoroalkyl substances ("PFAS") are ubiquitous, highly toxic environmental contaminants that are harmful to human health. They are often referred to as "forever chemicals" because they do not break down. PFAS chemicals are highly soluble and easily migrate in waterways and aquifers to spread contamination far and wide. Their physical and chemical properties make PFAS uniquely challenging, and costly, to mitigate, eliminate, reduce, or control in the environment, as the compounds continue to circulate through groundwater systems, surface water systems, municipal stormwater and wastewater systems, and the water cycle. PFAS chemicals pose a complex, long-term environmental hazard to the public, and a complex, costly management problem to public water providers such as Fairfax Water.

2. Defendants are responsible for this hazard. For decades, PFAS manufacturers like 3M (defined below) and DuPont (defined below) profited from the uncontrolled sale, use, and disposal of PFAS chemicals and PFAS-laden products while actively concealing their knowledge about the grave environmental and human health dangers of these compounds.

3. Defendants each designed, manufactured, marketed, distributed, supplied, and/or sold PFAS-based aqueous film-forming foam ("AFFF") products, and/or certain chemical ingredients incorporated into those products, that were used and discharged in the Potomac River watershed, the Occoquan Reservoir watershed, and in and near Fairfax County, and which now contribute to a serious environmental and public health crisis.

4. Defendants' conduct has caused contamination of natural resources located in and around Fairfax County, and in the watersheds of the Potomac River and the Occoquan Reservoir, including public drinking water supplies, as well as

stormwater, soils, surface waters, and other water systems and properties.

5. Fairfax Water provides drinking water to over two million people in the Northern Virginia communities of Fairfax County, Loudoun County, Prince William County, the Towns of Herndon and Vienna, the Cities of Alexandria, Falls Church, and Fairfax, and Fort Belvoir, as well as Dulles International Airport. Fairfax Water has responsibility for maintaining the integrity and quality of its water systems and water supplies, including resources in the extensive watersheds feeding the Potomac River and the Occoquan Reservoir.

6. Fairfax Water has investigated the presence of PFAS contamination in its water supplies and continues to conduct monitoring and analysis to conserve such resources, to ensure that the water it delivers is clean, safe and healthy, and to protect the public health. Fairfax Water is in compliance with all applicable regulations and standards concerning water quality, but remaining in compliance with such requirements will be costly.

7. Fairfax Water's continuing investigations have demonstrated the presence of elevated concentrations of PFAS chemicals in those resources and properties, including but not limited to perfluorooctane sulfonic acid ("PFOS") and perfluorooctanoic acid ("PFOA").

8. Upon information and belief, the PFAS contamination of Fairfax Water source waters resulted in whole or in part from the ordinary use and disposal of AFFF products.

9. Safer alternatives to AFFF not containing or breaking down into toxic PFAS were available when Defendants designed, manufactured, marketed, distributed, supplied, and/or sold the products that are the subject of this Complaint. Indeed, under regulatory pressure, several of the Defendants have altered the chemical make-up of their AFFF products to rely on fluorosurfactants that they claim are less biopersistent and less toxic. Defendants could have made such changes much sooner.

10. Despite their knowledge of the dangers of PFAS documented in several of Defendants' own internal communications, Defendants also failed to provide adequate warnings and instructions with their AFFF products and/or PFAS-based products used in the production of AFFF products. Indeed, Defendants failed to advise adequately about (i) the harms their PFAS-based AFFF products posed to the environment and human health; (ii) methods of environmentally safe disposal of their AFFF products; and (iii) designs of AFFF release sites, including firefighting training sites, that would limit or potentially eliminate the release of PFAS into the environment or otherwise mitigate their environmental effects.

11. At all times relevant to this action, Fairfax Water neither knew nor should have known of the actual or potential contamination of its resources and properties with dangerous PFAS compounds resulting from the ordinary and intended use and disposal of Defendants' AFFF products.

12. PFAS contamination of Fairfax Water's resources and properties, drinking water sources, water treatment and delivery infrastructure, and other environmental media and water systems, represents a public health threat that has and will result in significant costs, losses, and damages to Fairfax Water.

13. Fairfax Water is in the process of developing remedial measures to detect, control, reduce, and/or eliminate PFAS contamination, among other things, in drinking water supplies, systems, and equipment.

14. Fairfax Water brings this action against Defendants to recover all past, current, and future costs, losses, damages, and other relief relating to the actual or potential presence of PFAS traceable to Defendants' AFFF products and AFFF component products in its drinking water sources or supplies, reservoirs, and other water infrastructure and equipment.

15. Fairfax Water seeks to recover all damages available by law, including: compensatory and consequential damages; restitution; injunctive relief requiring

Defendants to abate injured or impaired Fairfax Water resources and properties; and all other relief available under law.

16. This action addresses only PFAS-related injuries attributable to the Defendants as a result of the design, manufacture, marketing, distribution, sale, use, and/or disposal of AFFF products and AFFF component products. To the extent Fairfax Water has suffered or may in the future suffer injuries relating to PFAS associated with a different application or other use of PFAS compounds, such claims are not included in this action, may be pursued in a separate action, and are expressly preserved.

## II. JURISDICTION

17. Jurisdiction is proper in this Court pursuant to Virginia Code § 8.01-328.1, Virginia Code § 8.01-330, and Virginia Code § 17.1-513.

18. Venue is proper in this Court pursuant to Virginia Code §8.01-262.

19. The Circuit Court has personal jurisdiction over Defendants in this action because Defendants have, among other things, conducted business in this jurisdiction and caused tortious injury in this jurisdiction.

20. Fairfax Water is headquartered in Fairfax County, and a substantial portion of its drinking water resources and properties that are the subject of this suit are located within the County.

## III. PARTIES

### PLAINTIFF

21. Plaintiff Fairfax County Water Authority (Fairfax Water, as defined above) was chartered in 1957 by the Virginia State Corporation Commission pursuant to the Virginia Water and Sewer Authorities Act, now the Virginia Water and Waste Authorities Act. Va. Code Ann. § § 15.2-5100 et seq. Fairfax Water is a self-supporting, public, not for profit water utility.

22. Fairfax Water is headquartered in Fairfax, Virginia.

23. Fairfax Water owns and operates drinking water systems, water

treatment systems, and water storage and delivery systems, providing drinking water to over two million residents and businesses in Northern Virginia.

24. Fairfax Water is the primary drinking water provider to residents of Fairfax County, the City of Falls Church and the City of Fairfax, pursuant to contracts with its account holders. Fairfax Water also holds contracts to provide wholesale water to Loudoun County Sanitation Authority, Prince William County Service Authority, Town of Herndon, Town of Vienna, Washington Dulles International Airport, Fort Belvoir, and American Water (Dale City and Alexandria).

25. Fairfax Water owns and operates the 120 million gallons per day ("MGD") Griffith Water Treatment Plant ("WTP"), and the 225 MGD Corbalis WTP, as well as water distribution and storage systems including finished water transmission and distribution mains, pump stations, ground and elevated storage tanks, reservoirs, and related infrastructure.

26. Fairfax Water sources its water principally from two surface water sources, the Potomac River and the Occoquan Reservoir. Water from the Potomac River is treated at the Corbalis WTP, and Occoquan Reservoir water is treated at the Griffith WTP.

27. Fairfax Water's public mission and its business mission is to provide safe, healthy, clean water to meet the needs of the people in its service area. It is dedicated to protecting water resiliency, including source water protection, risk mitigation, and drought protection.

28. The protection of drinking water sources under Fairfax Water ownership or management from environmental contamination and degradation is both a business necessity and an essential public function of Fairfax Water.

**DEFENDANTS**

29. Defendant 3M Company ("3M") is a Delaware corporation with its principal place of business in St. Paul, Minnesota. 3M designed, manufactured,

marketed, sold, and/or distributed AFFF products containing or breaking down into PFAS, including PFOS, PFOA, and PFHxS. 3M does business throughout the United States, including conducting business in Virginia. Upon information and belief, these 3M products were used and discharged into the environment in and around Fairfax Water's service area and its drinking water source watersheds.

30. Defendant Buckeye Fire Equipment Co. ("Buckeye") is an Ohio corporation with its principal place of business in Mountain, North Carolina. Buckeye designed, manufactured, marketed, sold, and/or distributed AFFF products containing or breaking down into PFAS. Buckeye does business throughout the United States, including conducting business in Virginia. Upon information and belief, these AFFF products were used and released into the environment in and around Fairfax Water's service area and its drinking water source watersheds.

31. Defendant AGC Chemicals Americas, Inc. ("AGC") is a Delaware corporation with its principal place of business in Exton, Pennsylvania. AGC does business throughout the United States, including conducting business in Virginia. Upon information and belief, AGC's fluorosurfactants were used to manufacture AFFF that was used and discharged into the environment in and around Fairfax Water's service area and its drinking water source watersheds.

32. Defendant Archroma U.S., Inc. ("Archroma") is a Delaware corporation with its principal place of business in Charlotte, North Carolina. Archroma does business throughout the United States, including conducting business in Virginia. Upon information and belief, Archroma's fluorosurfactants were used to manufacture AFFF that was used and discharged into the environment in and around Fairfax Water's service area and its drinking water source watersheds.

33. Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation with its principal place of business in King of Prussia, Pennsylvania. Upon information and belief, Arkema was formerly known as Atochem, Inc. and/or is the successor-in-interest

to Atochem, Inc. Arkema does business throughout the United States, including conducting business in Virginia. Upon information and belief, fluorosurfactants manufactured by Arkema and/or Atochem, Inc. were used to manufacture AFFF that was used and discharged into the environment in and around Fairfax Water's service area and its drinking water source watersheds.

34. Defendant Chemicals Incorporated ("Chem Inc.") is a Texas corporation with its principal place of business in Baytown, Texas. Chem Inc. does business throughout the United States, including conducting business in Virginia. Upon information and belief, fluorosurfactants manufactured by Chem Inc. were used to manufacture AFFF that was used and discharged into the environment in and around Fairfax Water's service area and its drinking water source watersheds.

35. Defendant Chemguard, Inc. ("Chemguard") is a Texas corporation with its principal place of business in Marinette, Wisconsin. Chemguard designed, manufactured, marketed, sold, and/or distributed AFFF products containing or breaking down into PFAS. Upon information and belief, these Chemguard products were used and discharged into the environment in and around Fairfax Water's service area and its drinking water source watersheds.

36. Defendant Tyco Fire Products LP ("Tyco") is a Delaware limited partnership with its principal place of business in Lansdale, Pennsylvania. Tyco is the parent corporation to Chemguard and successor-in-interest to the Ansul Company ("Ansul"). Tyco designed, manufactured, marketed, sold, and/or distributed AFFF products containing or breaking down into PFAS. Upon information and belief, these Tyco products were used and discharged into the environment in and around Fairfax Water's service area and its drinking water source watersheds.

37. Defendant BASF Corp. ("BASF") is a Delaware corporation with its principal place of business in Florham Park, New Jersey. BASF is a successor-in-interest to Ciba-Geigy Corporation. Upon information and belief, fluorosurfactants

manufactured by BASF and/or Ciba-Geigy Corporation or Ciba Specialty Chemicals, including those trademarked Lodyne™, were used and discharged into the environment in and around Fairfax Water's service area and its drinking water source watersheds.

38. Defendant the Chemours Co. is a Delaware corporation with its principal place of business in Wilmington, Delaware. Chemours Co. was previously a subsidiary of Old DuPont (as defined below) and was spun out of Old DuPont into an independent, publicly traded company on July 1, 2015.

39. Defendant the Chemours Co. FC, LLC is a Delaware LLC with its principal place of business in Wilmington, Delaware. Chemours Co. FC, LLC is a wholly-owned subsidiary of Chemours Co.

40. Defendants the Chemours Co. and the Chemours Co. FC, LLC are jointly referred to herein as "Chemours." Chemours designed, manufactured, marketed, sold, and/or distributed fluorosurfactants containing or breaking down into PFAS for use in the manufacture of AFFF. Upon information and belief, Chemours's fluorosurfactants, including those trademarked Capstone™, were used to manufacture AFFF that was used and discharged into the environment in and around Fairfax Water's service area and its drinking water source watersheds.

41. Defendant Corteva, Inc. is a Delaware corporation with its principal place of business in Wilmington, Delaware.

42. Defendant DuPont de Nemours, Inc. ("New DuPont") is a Delaware corporation with its principal place of business in Wilmington, Delaware.

43. Defendant EIDP, Inc. (formerly known as E. I. du Pont de Nemours and Company) ("Old DuPont") is a Delaware corporation with its headquarters and principal place of business in Wilmington, Delaware.

44. New DuPont, Old DuPont, Chemours, and Corteva, Inc. are referred to collectively as "DuPont." For decades, DuPont manufactured products containing

PFAS, including PFOA, which DuPont obtained from 3M. In the early 2000s, after 3M had ceased the manufacture of PFOS and PFOA, DuPont itself began to manufacture PFOA. DuPont designed, manufactured, marketed, sold, and/or distributed fluorosurfactants containing or breaking down into PFAS for use in the manufacture of AFFF. Upon information and belief, DuPont's fluorosurfactants, including those trademarked Capstone™, were used to manufacture AFFF that was used and discharged into the environment in and around Fairfax Water's service area and its drinking water source watersheds.

45. Defendant Clariant Corp. ("Clariant") is a New York corporation with its principal place of business in Charlotte, North Carolina. Clariant does business throughout the United States, including conducting business in Virginia. Upon information and belief, Clariant's fluorosurfactants were used to manufacture AFFF that was used and discharged into the environment in and around Fairfax Water's service area and its drinking water source watersheds.

46. Defendant Deepwater Chemicals, Inc. ("Deepwater") is a Delaware corporation with its principal place of business in Woodward, Oklahoma. Deepwater does business throughout the United States, including conducting business in Virginia. Upon information and belief, fluorosurfactants manufactured by Deepwater were used to manufacture AFFF that was used and discharged into the environment in and around Fairfax Water's service area and its drinking water source watersheds.

47. Defendant Dynax Corp. ("Dynax") is a Delaware corporation with its principal place of business in Elmsford, New York. Dynax does business throughout the United States, including conducting business in Virginia. Upon information and belief, Dynax's fluorosurfactants were used to manufacture AFFF that was used and discharged into the environment in and around Fairfax Water's service area and its drinking water source watersheds.

48. Defendant Carrier Fire & Security Americas LLC, *formerly known as*

Carrier Fire & Security Americas Corporation ("Carrier Fire") is a limited liability company organized under the laws of Delaware, with its principal place of business in Palm Beach Gardens, Florida. Carrier Fire is the indirect parent of Kidde-Fenwal, Inc. ("KFI"). Carrier Fire is a successor to UTC Fire & Security Americas Corporation, Inc. Carrier Fire, including through its contractual assumption of liabilities and its own independent conduct, designed, manufactured, marketed, sold, and/or distributed AFFF products containing or breaking down into PFAS, including AFFF products under the brands "Chubb," "Kidde," "Lenel," and other brand names. Carrier Fire does business throughout the United States, including conducting business in Virginia. Upon information and belief, Carrier Fire's AFFF products were used and discharged into the environment in and around Fairfax Water's service area and its drinking water source watersheds.

49. Defendant RTX Corporation, *formerly known as* Raytheon Technologies Corporation ("RTX") is a corporation organized under the laws of Delaware with its principal place of business in Arlington, Virginia. In April 2020, United Technologies Corporation ("UTC") merged with Raytheon Technologies Corporation, and thereafter the merged corporation was renamed RTX. At the time of the merger, UTC held AFFF liabilities due to UTC's design, manufacture, marketing, distribution and sale of PFAS-containing AFFF products, and also as the parent company of KFI, National Foam, Inc., and Kidde plc. In turn, KFI, National Foam, Inc., and Kidde plc, held AFFF liabilities as follows: In 2000, Williams plc demerged into Chubb plc and Kidde plc. KFI was a subsidiary of Kidde plc at the time of the demerger, and KFI's AFFF business became part of the newly formed Kidde plc. National Foam, Inc. was a subsidiary of Kidde plc at the time of the demerger, and National Foam, Inc.'s AFFF business became part of the newly formed Kidde plc. Kidde plc contractually acquired the assets of and contractually assumed the debts and liabilities of KFI, National Foam, Inc., and more generally the Kidde plc group of companies that it acquired. In July 2003, UTC acquired

Chubb plc, which became a business unit of UTC that focused on security and fire protection products and services. UTC contractually acquired the assets of Chubb plc and contractually assumed the debts and liabilities of Chubb plc. In 2005, UTC contractually acquired Kidde plc's assets and contractually assumed Kidde plc's debts and liabilities, including AFFF liabilities. At the time of this transaction, Kidde plc owned KFI and National Foam, Inc.'s AFFF businesses. Thus, as part of this transaction, UTC contractually assumed National Foam, Inc.'s assets, contractually assumed National Foam, Inc.'s debts and liabilities including AFFF liabilities, and contractually assumed KFI's assets and contractually assumed KFI's debts and liabilities, including AFFF liabilities. UTC is liable for the AFFF liabilities of KFI and National Foam, Inc. including but not limited through contractual assumption of liabilities and principles of successor liability. UTC was the ultimate parent of KFI from 2005-2020. RTX, in turn, is a successor to UTC and the AFFF liabilities held by UTC from UTC's design, manufacture, marketing, distribution and sale of AFFF products, and also as the parent company of KFI, National Foam, Inc., and Kidde plc. RTX, including through its contractual assumption of liabilities and its own independent conduct, has designed, manufactured, marketed, distributed, and/or sold PFAS-containing AFFF throughout the United States. Upon information and belief, these RTX products were used and discharged into the environment in and around Fairfax Water's service area and its drinking water source watersheds. RTX does business throughout the United States, including conducting business in Virginia.

50. Defendant Carrier Global Corporation, *formerly known as* Carrier Solutions Corporation ("Carrier Global") is a corporation organized under the laws of Delaware with its principal place of business in Palm Beach Gardens, Florida. In connection with the Raytheon Technologies Corporation and UTC merger into RTX in April 2020, UTC spun-off one of its reportable segments into Carrier Global, a separate, publicly traded company. Pursuant to the 2020 Separation and Distribution Agreement

by and among UTC, Carrier Global, and a third entity (Otis Worldwide Corporation), Carrier Global contractually assumed certain liabilities held by UTC, including those related to the AFFF businesses operated by KFI, National Foam, Inc., and Kidde plc. Carrier Global, through its contractual assumption of liabilities, and its own independent conduct, has designed, manufactured, marketed, distributed, and/or sold PFAS-containing AFFF throughout the United States, including products sold under the brand names "Chubb," "Kidde," and "Lenel." Upon information and belief, these Carrier Global products were used and discharged into the environment in and around Fairfax Water's service area and its drinking water source watersheds. Carrier Global does business throughout the United States, including conducting business in Virginia.

51. Defendant Nation Ford Chemical Co. ("Nation Ford") is a corporation organized and existing under the laws of South Carolina, with its principal place of business Fort Mill, South Carolina. Nation Ford does business throughout the United States, including conducting business in Virginia. Upon information and belief, Nation Ford supplied fluorochemicals containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products that were used and discharged into the environment in and around Fairfax Water's service area and its drinking water source watersheds.

52. Upon information and belief, Does 1-100 were designers, manufacturers, marketers, distributors, and/or sellers of AFFF products that have and continue to contaminate Fairfax Water's resources, properties, and drinking water source watersheds. Although the identities of these Doe defendants are currently unknown, it is expected that their names will be ascertained during discovery, at which time Plaintiffs will move for leave to add those persons as defendants in this litigation.

53. Throughout this Complaint, 3M, DuPont, Chemours, Buckeye, AGC, Archroma, Arkema, Chem Inc., Chemguard, Tyco, BASF, Clariant, Deepwater, Dynax, Carrier Fire, RTX, Carrier Global, Nation Ford, and Does 1-100, are referred to

collectively herein as "Defendants." Where differentiation of legal entities is necessary, this Complaint refers to particular companies individually.

## IV. FACTUAL ALLEGATIONS

### A. PFAS ARE DANGEROUS CHEMICALS THAT THREATEN HUMAN AND ENVIRONMENTAL HEALTH AND SAFETY

54. Per- and polyfluoroalkyl substances (PFAS, as defined above) are a group of synthetic chemical compounds containing fluorine and carbon atoms. They are known as "surfactants" in that they reduce the surface tension of water. As such, these chemicals have been used for decades in the manufacture of household and commercial products that resist heat, stains, oil, and water, including carpet and clothing treatments, cardboard packaging and leather products, emulsifiers, wetting agents, additives and coatings, processing aids in the manufacture of fluoropolymers such as nonstick coatings on cookware, and membranes for clothing that are both waterproof and breathable.

55. PFAS are human-made; they do not occur naturally.

56. The two most widely studied types of PFAS are PFOA and PFOS, both synthetic, fully fluorinated organic acids with eight carbon atoms.

57. Although PFOS and PFOA are the most widely studied types of PFAS, the PFAS family includes thousands of different chemicals. Defendants have incorporated dozens of different PFAS chemicals in their AFFF product formulations, including PFOA, PFOS, and PFHxS, among others.

58. PFAS compounds have a number of unique properties that, together, turn these chemicals into a grave threat to public health and the environment.

59. ***PFAS chemicals are mobile and persistent.*** They readily spread into the natural environment upon release, where they break down very slowly, if at all.

60. The compounds are characterized by multiple carbon-fluorine bonds, which are exceptionally strong and stable. As such, they are extremely persistent in the

environment and resistant to metabolic and environmental degradation.

61. PFAS compounds easily dissolve in water and are thus highly mobile and readily spread in the environment. They contaminate soils and leach from the soil into groundwater, where they can travel significant distances underground.

62. PFAS compounds are also volatile or semi-volatile. Small amounts of the chemicals are routinely and uncontrollably released in the vapor phase from PFAS-containing products and PFAS-contaminated sites and waterbodies, and travel with air currents in vapor form. When such vapors re-suspend or condense, the chemicals are deposited in new locations and environmental media, including surface waters, soils, and others.

63. Through both water and air, therefore, PFAS contamination is aggressively mobile and difficult to control.

64. ***PFAS chemicals bioaccumulate and biomagnify in the environment.*** Bioaccumulation occurs when an organism absorbs a substance at a rate faster than that at which the substance is lost by catabolism and excretion. Biomagnification is the increasing concentration of a substance in the tissues of organisms at successively higher levels in a food chain.

65. PFAS chemicals are extremely stable and persistent and as such, once ingested, tend to bioaccumulate in individual organisms for a significant period of time.

66. For example, PFOS, PFOA, and PFHxS, among other PFAS, have been shown to accumulate to levels of concern in fish, reaching concentrations of several thousands of times higher than in surrounding water. The compounds have been detected in both wild-caught and farmed fish, presumably as a result of bioaccumulation and/or trophic transfer, i.e., biomagnification up the food chain.

67. PFOA, PFOS, and PFHxS, among other PFAS, have also been shown to bioaccumulate in air-breathing species, including humans.

68. PFAS chemicals further bioaccumulate in the unborn and in infants by

crossing the placenta from mother to fetus and by passing to infants through breast milk.

69. PFAS chemicals biomagnify up the food chain—for example, when humans eat fish that have ingested the substances. PFOS has been observed in high concentrations in various animals higher up in the food chain, including bald eagles, walrus, narwhals, and beluga whales.

70. Finally, and critically, ***PFAS chemicals are toxic***. Numerous studies make plain that exposure to or ingestion of these chemicals can pose serious risks to humans and to animals.

71. Human epidemiological studies, relied upon by the United States Environmental Protection Agency ("EPA") for purposes of the agency's health advisories on PFOA, have found associations between PFOA exposure and high cholesterol, increased liver enzymes, decreased vaccination response, thyroid disorders, pregnancy-induced hypertension and preeclampsia, and testicular and kidney cancer.

72. Recent research conducted by the National Toxicology Program ("NTP"), a division of the National Institute for Environmental Health Sciences ("NIEHS"), has also linked exposure to extremely small amounts of PFOA to pancreatic cancer.

73. Alarmingly, when discussing the research at a conference on PFAS in June 2019, the director of NIEHS and NTP, Dr. Linda Birnbaum, told attendees that pancreatic tumors are present at "very, very low concentrations from PFOA." Dr. Birnbaum recommended that, to protect human health, the maximum concentration of PFOA should be 0.1 parts per trillion, or 700 times lower than the then current EPA health advisory level of 70 ppt in drinking water.

74. Human epidemiological studies, relied upon by the EPA for purposes of the agency's health advisories on PFOS, found associations between PFOS exposure and high cholesterol, thyroid disease, and adverse reproductive and developmental

effects, including gestational diabetes, preeclampsia, and low birth weight. The developing fetus and newborns are particularly sensitive to PFOS-induced toxicity.

75. In addition, PFAS compounds have been shown to affect growth, learning, and behavior of infants and older children, decrease women's ability to become pregnant and to carry a pregnancy to term, and interfere with the body's natural hormones.

76. PFOS and PFOA are toxic to laboratory animals, producing reproductive, developmental, and systemic effects in laboratory tests.

77. In November 2023, the World Health Organization's International Agency for Research on Cancer recognized that PFOA and PFOS present carcinogenic hazards to humans.

78. The EPA has found that current peer-reviewed scientific studies demonstrate that exposure to certain levels of PFAS may lead to a range of health problems, including "increased risk of some cancers, including prostate, kidney and testicular cancers."

79. A March 2020 peer-reviewed study applied ten key characteristics of carcinogens to 26 PFAS compounds, including PFOA, PFOS, and PFHxS. The "key characteristics of carcinogens" framework is used for cancer hazard identification.

80. That study found "strong evidence" that multiple PFAS induce oxidative stress, are immunosuppressive, and modulate receptor-mediated effects. The study found "suggestive evidence" that some PFAS can induce epigenetic alterations and influence cell proliferation.

81. In particular, the study identified evidence that: (a) PFOA induces epigenetic alterations; induces oxidative stress; induces chronic inflammation; is immunosuppressive; modulates receptor-mediated effects; and alters cell proliferation; (b) PFOS induces epigenetic alterations; induces oxidative stress; induces chronic inflammation; is immunosuppressive; modulates receptor-mediated effects; and alters

cell proliferation; and (c) PFHxS induces oxidative stress; is immunosuppressive; modulates receptor-mediated effects; and alters cell proliferation.

82. Similar traits associated with carcinogenicity were identified with respect to other PFAS compounds utilized in AFFF products designed, manufactured, marketed, distributed, provided, supplied, and sold by Defendants.

83. Another peer-reviewed study published in 2020 found further evidence that certain PFAS compounds, particularly PFOS and PFOA, result in premature births, decreased fertility, and increased odds of low birth weight. These adverse effects on reproductive health were demonstrated by an analysis of birth outcomes in Oakdale, Minnesota, where a portion of the population faced elevated exposure to PFAS due to long-term contamination of drinking water supplies from industrial waste disposal. The study focused on birth outcomes in the area from 2002 to 2011. Reproductive outcomes improved significantly following the installation of a water filtration facility in Oakdale at the end of 2006, demonstrating the causal relationship between exposure to high level of PFAS in drinking water and reproductive health.

84. In October 2021, EPA also released a final human health toxicity assessment for GenX chemicals, which incorporated new data available since 2018. GenX chemicals, as explained further below, were a trademarked family of short-chain PFAS chemicals marketed since the 2010s by DuPont as a purportedly safer alternative to PFOA. The EPA's assessment resulted in a lower, more protective toxicity value for GenX chemicals relative to EPA's 2018 draft toxicity assessment.

85. On November 16, 2021, EPA further provided the Science Advisory Board PFAS Review Panel with recent scientific data and new analyses that indicate negative health effects may occur at much lower levels of exposure to PFOA and PFOS than had previously been understood, and that PFOA is a likely carcinogen.

86. These EPA analyses underwent peer review, and in 2022, they formed the basis for revised health advisories for certain PFAS, and were relied upon in the

development of Maximum Contaminant Level Goals and a National Primary Drinking Water Regulation for PFOA and PFOS, and four other PFAS chemicals (described below).

87. The scientific consensus increasingly is that PFAS contamination, particularly PFOA and PFOS, in water supplies or natural resources to which humans are exposed, is cause for concern and a potential human health issue. Government regulators are following suit to tighten PFAS regulation, imposing increasing costs on water providers like Fairfax Water in order to protect consumers from the contamination that Defendants caused.

## B. THE PUBLIC'S UNDERSTANDING OF PFAS, A NATIONWIDE ENVIRONMENTAL PROBLEM, CONTINUES TO EVOLVE

88. Given their physical and chemical properties, PFAS chemicals have become incredibly widespread in the environment, contaminating drinking water supplies, water infrastructure (including stormwater systems, flood control systems, water treatment plants, drinking water delivery infrastructure, wastewater systems and biosolids), and posing an environmental and human health crisis in Fairfax Water's service area, in its drinking water source watersheds, and beyond.

89. Indeed, PFAS have been detected in environmental media and biota in many parts of the world, including oceans and the Arctic.

90. The chemicals have been found in cereals, fish, soft drinks, milk, olive oil, and meat, as well as in prepared foods.

91. According to the EPA, between 1999 and 2012, PFOA and PFOS have been detected in the blood serum of 99 percent of the U.S. population. This is particularly troubling given the real and significant adverse health effects these chemicals pose.

92. The Director of the U.S. Center for Disease Control's National Center for Environmental Health, Patrick Breysse, described the chemicals in October of 2017 as "one of the most seminal public health challenges for the next decades" and estimated

10 million Americans were drinking contaminated water. Current research estimates that this number is significantly higher—likely in the hundreds of millions of Americans.

93. This understanding of PFAS contamination as a widespread public health crisis has been slow to evolve, however, and has only recently garnered broad attention. Indeed, although the EPA began to investigate the safety of PFOA and PFOS in or around 1998 following some limited disclosures by 3M and others, the agency did not begin to issue health advisories for these chemicals until January 8, 2009.

94. The 2009 EPA health advisory noted merely that "action should be taken to reduce exposure" to drinking water containing levels of PFOA and PFOS exceeding 400 parts per trillion ("ppt") and 200 ppt, respectively.

95. In May 2016, the EPA significantly revised its PFOA and PFOS health advisory, recommending that drinking water concentrations for PFOA and PFOS, either singly or combined, should not exceed 70 ppt.

96. Notably, the EPA's health advisories are "informal technical guidance to assist federal, state, and local officials, as well as managers of public or community water systems in protecting public health. They are not regulations and should not be construed as legally enforceable federal standards."

97. As more becomes known, and as laboratory detection methods have evolved to detect smaller and smaller amounts of PFAS, the EPA has increased it regulation of PFAS.

98. In November 2020, EPA announced its intention to address PFAS in NPDES permits issued by EPA. And in September 2021, EPA announced that it was initiating three new rulemakings to reduce PFAS contamination in wastewater discharges from several key industries.

99. In January 2023, the EPA released its Effluent Limitations Guidelines Plan 15, setting technology-based standards for industries that discharge PFAS. This

Plan announced rulemakings to address discharges from landfills, and a new Publicly Owned Treatment Works Influent Study. This study will collect more data on discharges into wastewater streams from a broad range of industries and will form the basis for PFAS Effluent Limitations Guidelines ("ELGs") in the future.

100. On the drinking water front, on February 22, 2021, EPA finalized its decision to regulate levels of PFOS and PFOA in drinking water under the Safe Drinking Water Act, including by proposing enforceable MCLs.

101. In June 2022, EPA announced drastically reduced health advisories for PFOA and PFOS in drinking water, reducing the tolerance for these contaminants from 70 ppt to 0.004 ppt and 0.020 ppt, respectively. In other words, 0.004 ppt is 4 parts per quadrillion ("ppq"), and 0.020 ppt is 20 ppq.

102. At the same time, EPA also announced new health advisory levels for GenX (10 ppt) and perfluorobutane sulfonic acid ("PFBS") (2,000 ppt).

103. In March 2023 the EPA proposed, and on April 10, 2024 the EPA finalized, enforceable MCLs for six PFAS known to occur in drinking water, including PFOA, PFOS, perfluorononanoic acid ("PFNA"), GenX, PFHxS, and PFBS. The MCL for PFOS and PFOA is 4 ppt for each, and for PFHxS, PFNA, and GenX the MCL is 10 ppt for each. The PFAS chemicals subject to this regulation apart from PFOA and PFOS are subject to a Hazard Index when mixtures contain two or more of them. In addition, the EPA enacted advisory Maximum Contaminant Level Goals of zero for both PFOS and PFOA.

104. The EPA is conducting a risk assessment of PFOS and PFOA in biosolids to be completed in December 2024. The EPA is also developing principles for "managing biosolids as awareness of PFAS occurrence in biosolids continues to grow."

105. On April 17, 2024, the EPA designated PFOA and PFOS as hazardous substances under federal environmental laws.

106. The Commonwealth of Virginia has likewise developed and promulgated

guidance and an evolving variety of rules and regulations concerning PFAS contamination of drinking water supplies and other media.

107. In 2020 (with additions in 2021 and 2022), the Virginia General Assembly directed the Commissioner of Health to convene a work group to study the occurrence of PFAS in public drinking water, and to recommend state MCLs as necessary.

108. The Virginia Department of Health ("VDH") tested selected water sources of 45 different water providers in the state, including Fairfax Water's Griffith WTP finished water.

109. Beginning July 1, 2023, Virginia law has required certain industrial users discharging to Publicly Owned Treatment Works (POTW) to test for PFAS chemicals and report results to the receiving POTW.

110. The VDH, Office of Drinking Water is responsible for enforcing drinking water regulations and works closely with water utilities to monitor the water that is provided to Virginia residents.

111. Beginning July 1, 2024, state law requires the VDH to notify the Virginia Department of Environmental Quality ("DEQ") of detections of PFAS in finished water from public water systems above established MCLs and subsequently for DEQ to develop a priority plan for PFAS assessments to identify sources of PFAS in public water systems' raw water sources.

112. Fairfax Water is now working to investigate, assess, and design appropriate water treatment system modifications to comply with the federal drinking water MCLs finalized in April 2024, which must be met by April 2029.

## C. DEFENDANTS' AFFF PRODUCTS HAVE FOR DECADES CONTAMINATED THE ENVIRONMENT WITH PFAS

113. The PFAS application critical to the claims asserted in this Complaint is AFFF, which is widely used to suppress and extinguish fires of flammable liquids, such as fuel and oil.

114. In the 1940s, 3M began to experiment with a process called electrochemical fluorination to create the carbon-fluorine bonds that are the key components of PFAS, including PFOA, PFOS, and PFHxS.

115. The other major carbon-fluorine bond producing process, which was used by the remaining Defendants, is called telomerization. This process generally results in PFOA and other carboxylates.

116. Beginning in the 1950s through 2000, 3M sold PFOA to DuPont for use in DuPont's manufacturing operations. After 3M ceased production beginning in or around 2000, DuPont began producing PFOA.

117. Recognizing the compounds' strong surfactant properties described above and building on its earlier experiments, 3M began to develop AFFF containing PFOS in the early 1960s to suppress flammable liquid fires that cannot be effectively extinguished with water alone.

118. In the late 1960s, the United States military issued military specification MIL-F-24385 governing the requirements for AFFF ("AFFF Mil Spec"). It required that the AFFF concentrate "consist of fluorocarbon surfactants plus other compounds . . ." The AFFF Mil Spec, however, contains no further requirements concerning these fluorocarbons surfactants, such as the length of the fluorine-carbon chain. The AFFF Mil Spec also states that "[t]he material shall have no adverse effect on the health of personnel when used for its intended purpose." The current version of the AFFF Mil Spec still contains that language.

119. The United States government has expressly clarified that the AFFF Mil Spec "was a performance military specification (as opposed to a detail military specification); meaning that the product manufacturers [and not the United States government] determine[d] the exact formulation and specific perfluorocarbon surfactants . . ."

120. From the 1960s to about 1973, 3M was the sole supplier of AFFF.

Beginning in about 1973, fluorotelomer-based AFFF manufacturers entered the market.

121. AFFF is applied by firefighters in the field by mixing foam concentrate and water to make a foam solution. When applied to a fire, the foam solution is aerated at the nozzle. The foam solution is sprayed out to coat the fire, blocking the supply of oxygen feeding the fire and creating a cooling effect and evaporation barrier. A film also forms to smother the fire after the foam has dissipated:




122. In other words, it is intended by, and foreseeable to, the AFFF manufacturer or supplier that AFFF will be mixed with water and sprayed in such a manner that it can freely seep into the groundwater and soil, contaminating the environment.

123. PFAS-based AFFF is the predominant commercial PFAS application that, when used as intended, releases toxic chemicals directly into the environment in a manner enabling them to freely seep into the groundwater, contaminate drinking water supplies, and travel long distances to cause further, widespread environmental contamination.

124. A single firefighting event or training exercise may result in the release of thousands of gallons of foam solution laced with PFAS that then enter and contaminate the environment.

125. For decades, PFAS-based AFFF products have been stored and used for fire suppression, fire training, and flammable vapor suppression at hundreds of locations, such as fire training schools, military installations, and civilian airports, as well as at petroleum refineries, storage facilities, and chemical manufacturing plants throughout the United States, including in and around Fairfax Water's service area and its drinking water source watersheds.

126. Additionally, local fire departments used and maintained quantities of AFFF in their inventories.

127. Fire training exercises involving AFFF are common, particularly on airfields, fire training schools, and military installations, and have been performed many thousands of times since the 1960s, each time releasing vast quantities of toxic chemicals into the environment.

128. AFFF use has been identified as one of the main contributors to the widespread environmental contamination with PFAS.

129. Despite the general phase-out of certain long-chain PFAS, further discussed below, much of the current AFFF stockpiles still contain long-chain PFAS constituents due to the long shelf-life of these products. PFAS-based AFFF thus continues to be widely stored and used, including in or around Fairfax Water's service area and its drinking water source watersheds.

130. Significantly, in recognition of the dangers of PFAS, the AFFF Mil Spec was amended in September 2017 to state expressly that the Department of Defense seeks "to acquire and use a non-fluorinated AFFF formulation or equivalent firefighting agent to meet [its] performance requirements …." and again in April 2020 to make clear that the AFFF Mil Spec requires only that AFFF "[c]oncentrates shall consist of

surfactants plus other compounds…" – not necessarily fluorosurfactants. Most recently in January 2023, the Department of Defense updated the Mil Spec to set performance standards for fire-fighting foam concentrates specifying the concentrates are to contain no intentionally added PFAS, and no more than 1 part per billion of PFAS when tested.

131. Had Defendants been forthright about their products' chemical properties and the environmental and human health hazards they posed, the Department of Defense (and federal and state regulatory agencies) would have taken steps to prevent, control, or minimize the environmental and human health threats from AFFF containing and/or breaking down into PFAS (including PFOA, PFOS, and PFHxS), much sooner, or would never have used them in the first place.

## D. THE DEFENDANTS KNEW ABOUT BUT CONCEALED THE DANGERS OF PFAS CONTAINED IN AFFF

132. Particularly 3M and DuPont have known or, at a minimum, should have known for many decades that PFOA, PFOS, and other PFAS compounds are mobile and persistent, bioaccumulative and biomagnifying, volatile, and, above all, toxic.

133. Upon information and belief, the other Defendants, each of which designed, manufactured, marketed, provided, supplied, sold, and/or distributed PFAS-based AFFF and/or AFFF component products, likewise knew of the dangers posed by PFAS, including through information they obtained as part of their participation in trade industry associations.

134. Upon information and belief, all Defendants were careful to withhold the most damning information about PFOS, PFOA, and other PFAS from the public and regulators.

135. 3M conducted extensive toxicity studies on PFAS, including PFOS and PFOA, as early as the 1950s, concluding that the chemicals were toxic.

136. Further toxicity studies conducted by 3M scientists in the late 1970s confirmed that the chemicals were even "more toxic than anticipated."

137. In 1978, 3M conducted studies on monkeys and rats, feeding them various

dosages of PFOS and PFOA. All monkeys in the study died within the first few days after being given PFOS at a dosage of 4.5 mg/kg/day. Monkeys being given 100 mg/kg/day of PFOA "all died during weeks 2 and 5 of the study." The companies' studies showed that both PFOA and PFOS affected the liver and gastrointestinal tract of the species tested.

138. 3M concluded that PFOS was "the most toxic" of the compounds studied and "certainly more toxic than anticipated."

139. 3M consulted with Harold Hodge, a well-known toxicologist, who emphasized that it was of "utmost importance" to determine whether these chemicals "or its metabolites are present in man, what level they are present, and the degree of persistence (half-life) of these materials."

140. Further, in 1975, 3M was alerted by third-party researchers that PFOS was detectable in human blood serum and thus had obviously spread beyond the immediate site of its applications and was bioaccumulating. 3M's own research confirmed by the next year that the level of fluorochemicals in the blood of its own workers was "1,000 times normal."

141. Conducting research around its manufacturing plants, 3M knew by 1979 that its fluorochemicals "bioaccumulated more readily in the gastrointestinal tract, fat and reproductive system [at least in] channel catfish[.]"

142. By 1979, 3M recognized that fluorochemicals may pose a cancer risk. Indeed, one of its scientists pressed that it was "paramount to begin now an assessment of the potential (if any) of long term (carcinogenic) effects for these compounds which are known to persist for a long time in the body and thereby give long term chronic exposure."

143. 3M never published its toxicity studies and worked actively and willfully to stifle research on the adverse effects of PFAS, including PFOA and PFOS. Indeed, 3M kept John Giesy, Ph.D., Professor and Canada Research Chair in Environmental

Toxicology in the Department of Veterinary Biomedical Sciences and Toxicology Centre at the University of Saskatchewan, on its payroll to the tune of millions of dollars, for the purpose of influencing independent academic research. It was Professor Giesy's professed goal to keep unfavorable papers regarding PFAS out of the academic literature, lest plaintiffs find scientific support for legal theories seeking to hold 3M liable for injuries.

144. 3M also advised its employees not to put their thoughts and research concerning PFOS or PFOA in writing, as such communications would need to be disclosed during discovery in likely litigation.

145. 3M also knew full well the environmental implications associated with PFAS compounds, including PFOS and PFOA, but refused to allow testing to perform precise ecological risk assessments. One of its longtime scientists, Dr. Richard Purdy, stated in an internal email, "PFOS is the most onerous pollutant since PCB and you want to avoid collecting data that indicates that it is probably worse. I am outrage[d.]"

146. Despite 3M's knowledge of PFAS toxicity and potential carcinogenicity, the mobility and persistence in the environment of such chemicals, and their tendency to bioaccumulate and biomagnify, the company continued to manufacture, sell, and distribute PFAS-based AFFF until at least 2000.

147. Dr. Purdy resigned, exhausted by the company's "roadblocks, delays, and indecision" concerning research on PFAS' environmental effects and its failure to address their known environmental harms:

- 3M continues to make and sell these chemicals, though the company knows of an ecological risk assessment I did that indicates there is a better than 100% probability that perfluorooctansulfonate is biomagnifying in the food chain and harming sea mammals. This chemical is more stable than many rocks. And the chemicals the company is considering for replacement are just as stable and biologically available. The risk assessment I performed was simple, and not worst case. If worst case is used, the probability of harm exceeds 100,000%.

Dr. Purdy concluded that he could no longer work for a company "concerned with markets, legal defensibility and image over environmental safety."

148. Dr. Purdy copied the EPA on his March 1999 resignation letter.

149. Shortly thereafter, 3M supplemented its prior submissions to the EPA with critical information referenced by Dr. Purdy. In 2000, 3M "voluntarily" ceased production of certain PFAS compounds, including PFOS and PFOA.

150. In April 2006, 3M paid a penalty of more than $1.5 million to the EPA for its failure to disclose pertinent studies regarding PFOA and PFOS.

151. Much like 3M, DuPont has been aware of the toxicity of PFAS, including PFOA, for decades.

152. By 1961, DuPont's own researchers had concluded that PFOA was toxic and should be "handled with extreme care." During the 1960s, DuPont also had knowledge that PFOA caused adverse liver reactions in dogs and rats.

153. By 1976, DuPont was also aware of research reports that detected organic fluorine in blood bank samples in the U.S., which the researchers believed to be a potential result of human exposure to PFOA. In other words, DuPont knew or should have known that PFOA was traveling in the environment and bioaccumulating in other organisms including in people.

154. By 1982, DuPont's corporate medical director, Bruce Karrh, in internal correspondence confirmed that PFOA stays in the blood for a long time and registered his concern that members of the local community may be affected by PFOA releases. DuPont then began a clandestine water sampling program to determine how far a distance from its operations PFOA remained in the waterways at elevated levels. DuPont detected PFOA in water supplies at a distance of at least 79 miles from its Parkersburg plant.

155. In 1979, DuPont further became aware of the PFOA/PFOS toxicity studies 3M had conducted on monkeys and rats described above.

156. About three years later, 3M also shared a study undertaken on pregnant rats, indicating that PFOA led to adverse effects in fetuses. DuPont tested the blood of

female workers who had given birth and had been exposed to PFOA, documenting that PFOA moved across the human placenta.

157. DuPont transferred all women out of work assignments with potential exposure to PFOA, but concealed its pregnancy-related study from the workers, the EPA and the public.

158. During the mid-1980s, DuPont continued to find evidence of toxicity of PFOA. In 1985 and 1986, researchers from DuPont's Haskell Laboratory for Toxicology and Industrial Medicine published two studies on the toxicity of PFOA. One study found PFOA to be "moderately toxic," producing "an increase in liver size and corneal capacity" in rats exposed by inhalation to PFOA; the other studied dermal toxicity in rats and rabbits and found skin irritation in both, and increased liver size in rats.

159. By 1988, DuPont was aware that at least one toxicity study performed on laboratory rats revealed a relationship between PFOA exposure and increased rates of certain types of cancer, including testicular cancer.

160. In 1988, DuPont internally classified PFOA as a possible human carcinogen.

161. Evidence of PFOA's toxic effects continued to mount. In 1999, DuPont received data from a laboratory study on the effects of PFOA exposure on primates that showed that two of twenty-two monkeys had died, including one that had received the lowest dose of PFOA. And, by June 2000, DuPont was aware that the American Council of Governmental and Industrial Hygienists had designated PFOA as a "confirmed animal carcinogen."

162. Despite its knowledge of PFOA's toxicity and carcinogenicity, its mobility and persistence in the environment, and its tendency to bioaccumulate, DuPont continued to use PFOA in its products (and, beginning in 2002, also manufactured the chemical once its primary manufacturing source, 3M, had exited that market), including surfactants made for use in the manufacture of AFFF.

163. Having doubled down on the PFAS business, DuPont continued to actively conceal the risks of PFOA and other PFAS from the public. Beginning in 2003, DuPont paid various consultants, including The Weinberg Group, thousands of dollars to implement a comprehensive strategy to attack and discredit those who alleged adverse health effects from PFOA, to prevent third parties from connecting DuPont to PFOA health problems, to coordinate media and third-party communications, and to thwart any PFOA-related litigation.

164. In February 2003, a manager at DuPont's Parkersburg plant made knowingly false and misleading statements to the media, that: "[i]n more than 50 years of [PFOA] use by [DuPont] and others, there have been no known adverse human health effects associated with the chemical," that "all" of the available scientific research "has been provided to both state and federal regulators," that "epidemiological studies of workers do not indicate an increased risk of cancer associated with exposure to [PFOA]," that "[DuPont] has made significant efforts to respond to the public honestly and openly with correct information about [PFOA]," and that "the use of [PFOA] at the Washington Works site has not posed a risk to either human health or the environment."

165. Later, in March and April of 2003, various DuPont employees and executives — including its Vice President and General Manager of Fluoroproducts, the Director of its Haskell Laboratory, its spokesperson for the Plant, and its CEO — made public statements denying that DuPont had seen any negative impacts on human health or the environment caused by DuPont's use of PFOA.

166. DuPont made multiple, additional knowingly false and misleading public statements regarding the toxicity and adverse health effects of PFOA and other PFAS.

167. DuPont settled the Parkersburg resident litigation in 2005, as part of which settlement DuPont would financially support what was dubbed the "C8 Science Panel," made up of three independent epidemiologists from Emory University, Brown

University, and the London School of Hygiene and Tropical Medicine, and tasked with researching the health effects of PFOA based on blood samples and other health data taken from almost 70,000 residents of the mid-Ohio Valley.

168. Also in 2005, the EPA fined DuPont $16.5 million, then the largest civil administrative penalty the agency had ever issued, for the company's failure to report possible health risks associated with PFOA.

169. With the writing on the wall and upon invitation by the EPA, DuPont agreed in 2006 to join the "PFOA Stewardship Program" working towards the elimination of PFOA by 2015.

170. In the meantime, however, the company continued to manufacture PFOA, and at least until 2008 the company made fluorotelomers with PFOA byproducts for the express and intended purpose of being used in the manufacture of AFFF.

171. The C8 Science Panel completed its research in 2013, finding likely connections between PFOA and high cholesterol, ulcerative colitis, pregnancy-induced hypertension, thyroid disease, testicular cancer, and kidney cancer.

172. Beginning in 2013, DuPont replaced its production and use of PFOA with GenX chemicals.

173. GenX is the trade name for the short-chain PFAS chemicals, including hexafluoropropylene oxide dimer acid, that allow for the creation of fluoropolymers without PFOA.

174. DuPont first began generating GenX in or around 1980, but it remained a chemical byproduct of other manufacturing processes until the 2010s.

175. While DuPont, in a 2010 marketing brochure, touted GenX as having "a favorable toxicological profile," studies have shown that exposure to GenX has negative health effects, suggestive of cancer, on the kidney, blood, immune system, developing fetuses, and especially in the liver following oral exposure. Indeed, as discussed above, based on continuing human health effects assessment research for GenX chemicals

since 2018, the EPA has recently issued an MCL of 10 ppt for GenX in drinking water.

176. Further, like PFOA and other PFAS compounds, GenX is persistent in the environment, not readily biodegradable, and mobile in the presence of water.

177. DuPont acknowledged in the same brochure referenced above that GenX "is chemically stable and, if released, would be environmentally persistent."

178. Following the 2015 Chemours spin off from Old Dupont, Chemours took over production of legacy DuPont PFAS chemistry, including GenX.

179. Like DuPont, Chemours has, since 2015, designed, manufactured, marketed, distributed, and sold its PFAS compounds, including GenX, for use in AFFF products.

180. Upon information and belief, the remaining Defendants also knew, or should have known, that in its intended and common use, PFAS-based AFFF and/or AFFF component products would injure and/or threaten the environment and public health. This information was accessible to each of them, including as part of their ongoing involvement in various trade associations constituted for the purpose of defending the AFFF franchise, including the Firefighting Foam Coalition ("FFFC").

181. RTX, Carrier Fire and Carrier Global, through their own actions and those of their predecessor entities whose AFFF liabilities they contractually assumed, recognized that they were subject to liability for their AFFF products.

182. UTC, now known as RTX, further knew that the FFFC falsely told the federal government that UTC's telomer-based AFFF did not contain C8 surfactants. In a 2008 email exchange, two UTC employees discussed the FFFC's claim to DOD that telomer-based products were made with C6 surfactants rather than C8 surfactants. They agreed this claim was untrue and was likely done to distinguish telomer AFFF from 3M's discredited AFFF. One of UTC's employees observed that the FFFC had been "economical with the truth" when it led "the EPA to believe that firefighting foam agents were only made with C6 surfactants."

183. Additionally, all Defendants knew or, at a minimum, should have known that their PFAS-based AFFF and/or AFFF component products, given their chemical composition, easily dissolve in water (and indeed the products were designed to be mixed with water and sprayed on the ground), are mobile, resist degradation, and tend to bioaccumulate and biomagnify.

184. Despite their knowledge of the harmful properties of PFAS chemicals, following 3M's withdrawal from the PFOA/PFOS market beginning in or around 2000, DuPont and the other Defendants made renewed commitments to protect their lucrative AFFF lines of business.

185. In response to concerns expressed by the EPA regarding the environmental viability of AFFF, the FFFC was formed in 2001, partly to dispel such concerns. DuPont was a founding member. At least Chemguard, Tyco, National Foam, Inc., and Dynax are current members.

186. The FFFC lobbied hard for AFFF. At conferences, in journals, and in meetings with the military, the EPA, and other regulators, it repeated a key talking point: only one PFAS chemical, PFOS, had been taken off the market. Thus, the FFFC asserted, since the FFFC members' products did not contain PFOS, their products were safe. However, they knew their products contained PFOA and other PFAS chemicals, which Defendants knew or, at a minimum, should have known were equally harmful to the environment and public health.

187. DuPont and other Defendants eventually transitioned to the use of short-chain fluorotelomers with a maximum of six carbon atoms, claiming those chemicals are safer to environmental and human health.

188. Even if such claims were true, Defendants could have begun much earlier to transition from long-chain to short-chain fluorotelomers. Despite their claims that these short-chain alternatives substantially mitigate the risk of human and environmental harm from AFFF products, they failed to adopt what would present a

feasible alternative to the then-current formulations of PFAS-based AFFF. Their refusal to adopt this safer feasible alternative confirms that their products based on long-chain fluorotelomers were not reasonably safe for their intended applications.

189. Moreover, effective fluorine-free firefighting foams that do not pose the same risks to human health and the environment as Defendants' products exist and are used in some of the world's largest airports, including London Heathrow, London Gatwick, Copenhagen, Stuttgart, and Dubai, amongst others.

190. All 27 of Australia's airports have been using fluorine-free foams for many years.

191. Indeed, leading fire safety and regulatory experts have opined that there are simply no justifications for continued use of toxic foams given this successful, widespread use of the environmentally safe alternative.

192. According to a report issued by a panel of experts of IPEN, a global network of public interest NGOs dedicated to the reduction of toxic chemicals, fluorine-free firefighting ("F3") foams are viable alternatives, and comparable by all measures, to fluorinated AFFF.

193. But unlike fluorinated foams, F3 foams do not pollute the environment indefinitely, or put human or animal health at risk; there is no expensive clean up; remediation costs are negligible or zero; and there are no significant legal and financial liabilities. Public health values such as clean drinking water are not compromised, and, finally, there is no erosion of public confidence in political institutions and government agencies.

194. Defendants failed to adequately research and investigate the design, manufacture, or sale of fluorine-free firefighting foam, or did so and concealed their results. They avoided fluorine-free alternatives to protect their existing, lucrative AFFF lines of business.

195. Defendants' failure to pursue this feasible alternative to PFAS-based

AFFF further confirms that their AFFF products were not reasonably safe for their intended applications.

## E. DEFENDANTS' AFFF PRODUCTS HAVE CAUSED (AND CONTINUE TO CAUSE) WIDESPREAD PFAS CONTAMINATION IN AND AROUND FAIRFAX WATER'S SERVICE AREA AND ITS DRINKING WATER SOURCE WATERSHEDS

196. Defendants' PFAS-based AFFF products have been used for decades at locations and facilities throughout Virginia, including within Fairfax Water's service area, and throughout the Potomac River and Occoquan Reservoir watersheds.

197. PFAS-based AFFF products used and disposed in the ordinary and intended manner throughout Fairfax Water's service area and its drinking water source watersheds, have contaminated surface waters from which Fairfax Water sources its drinking water, as well as Fairfax Water's treatment and delivery infrastructure and equipment, and other properties.

198. Defendants' PFAS-based AFFF products used and disposed in the ordinary and intended manner have further contaminated soils and natural resources within Fairfax Water's service area and within its drinking water source watersheds.

199. For example, upon information and belief, such products have been used for decades in firefighting training exercises at the Fairfax County Fire and Rescue Training Center at 4600 West Ox Road in Fairfax.

200. Upon information and belief, PFAS-laden AFFF products have also been used for decades to train first responders at the Prince William County Public Safety Training Center, located at 13101 Public Safety Drive, in Nokesville, Virginia.

201. In addition to use of AFFF in fire training, it was used to fight fires within the Fairfax Water source watersheds, including:

a. On July 7, 2011, 300 gallons of foam was used to put out a mulch fire at a business located in Chantilly, Virginia within the Occoquan Reservoir watershed.

b. On December 9, 2006, a garbage truck fire was extinguished with AFFF in the Occoquan Reservoir watershed in Fairfax County.

c. On November 28, 2000, firefighters discharged 2,700,000 gallons of AFFF onto the Dogwood Elementary School and its grounds in Fairfax County as it burned to the ground, resulting in a fish kill in the nearby Stave Run. Dogwood Elementary was located within the Potomac River watershed, upstream from Fairfax Water's intakes.

202. The U.S. Department of Defense reported in 2022 that it had detected PFOA at 1,300 ppt and PFOS at 450 ppt in groundwater at the decommissioned Vint Hill Farms Station. Areas within this 701-acre site in the Occoquan Reservoir watershed were reportedly used for monthly fire training exercises including at an unlined pit that would be partially filled with petroleum and natural gas odorant and then ignited. The pit was decommissioned in the 1980s and filled with half-inch gravel.

203. AFFF containing PFAS was used for firefighter training, possibly as early as the 1970s, at the Shepherd Field Air National Guard Base in Martinsburg, West Virginia, within the Potomac River watershed upstream from Fairfax Water's intakes. The Department of Defense reported in December 2021 that it had detected levels of combined PFOA and PFOS at 64,600 ppt in groundwater at the base. Department of Defense also reported that PFAS from the AFFF seeped into the soil and over time moved into the groundwater at offsite locations, including in off-base drinking water which registered 135 ppt combined PFOA and PFOS.

204. The Camp Letterkenny Army Depot in Chambersburg, Pennsylvania is also partially located in the Potomac River watershed upstream of the Fairfax Water intakes. Soils, surface water and ground water at this 1,692-acre facility were found to be heavily contaminated with PFOA, PFOS, and PFBS as summarized in a 2022 investigation report to the U.S. Army Corps of Engineers. For example, one monitoring well registered 1,840 ppt PFOS, 229 ppt PFOA and 12 ppt PFBS when tested for those

chemicals in 2017. Another monitoring well on base registered 890 ppt PFOS, 119 ppt PFOA, and 68.2 ppt PFBS that year. PFAS contaminated areas at Camp Letterkenny include the Property Disposal Office Area - Oil Burn Pit, the Former Concrete Lined Fire Training Area, and the current Fire Department Station.

205. The U.S. Navy-owned facility, Allegany Ballistics Laboratory, in Keyser, West Virginia is upstream in the Potomac River watershed and is also a likely source of AFFF contamination. Based on historic practices at the site, the Navy is investigating PFOA and PFOS contamination there, and the Department of Defense reported to Congress in October 2017 that AFFF was used there and likely released.

206. Alliant Techsystems Operations LLC, a subsidiary of the Northrup Grumman Corporation, operates the Allegany Ballistics Laboratory under a lease with the Navy, and Alliant is responsible for the NPDES permit there. Alliant paid a $350,000 fine in 2021 related to hazardous waste disposal and spillage. Its NPDES reports consistently show discharges of PFAS into the Potomac River watershed, including in July 2023 at levels as high as PFOA at 233 ppt, PFHxA at 72.3 ppt, PFHxS at 227 ppt, PFPeS at 57.2 and PFBA at 11.1 ppt.

207. AFFF products were used at Fort Detrick in Frederick, Maryland, including in fire training exercises, in the Potomac River watershed upstream of Fairfax Water's intakes. Soils, surface water and ground water at this site were found to be widely contaminated with PFOA, PFOS, and PFBS as summarized in a 2022 investigation report to the U.S. Army Corps of Engineers. For example, monitoring wells registered PFOS as high as 43 ppt, PFOA up to 41 ppt, and PFBS up to 5.3 ppt. Testing of surface waters registered PFAS detections up to 7.4 ppt PFOS, 4.4 ppt PFOA and 4.4 ppt of PFBS.

208. Dulles International Airport in Sterling, Virginia drains partially to the Potomac River watershed and partially to the Occoquan Reservoir watershed, and is a likely source of PFAS contamination attributable to AFFF. For example, on June 24,

2017, a call to EPA's National Response Center reported a failure of the fire suppression system in the American Airlines hangar, resulting in the release of 600 gallons of AFFF.

209. Manassas Regional Airport in Manassas, Virginia is also a likely source of PFAS contamination attributable to AFFF in the Occoquan Reservoir watershed. For example, on February 7, 2020, an airplane was started inside a hangar at the airport, triggering a malfunction of the AFFF sprinkler system. According to an incident report, mountains of foam were released in the hangar, and flowed out around the grounds of the hangar and across the road.





(Photo of the Interior of the Airplane Hangar (left), and two photos of the Hangar Exterior on July 7, 2020).

210. Additional airports within the Potomac River watershed are likely sources of PFAS contamination attributable to AFFF. As Federal Aviation Administration ("FAA") Part 139 airports, both the Shenandoah Valley Regional Airport, in Weyers Cave, Virginia, and the Hagerstown Regional Airport, in Hagerstown, Maryland, were required to store AFFF on site, which created a high likelihood of AFFF use, spills, or leaks at these sites.

211. Upon information and belief, AFFF was also stored and potentially used, spilled or leaked at the Greater Cumberland Regional Airport in Wiley Ford, West Virginia, at Frederick Municipal Airport in Frederick, Maryland, and at Leesburg Executive Airport in Leesburg, Virginia. While the FAA did not require these airports to store AFFF on site, it was considered best practice to store it at all airports.

212. Testing of fish tissue and water in the Potomac River, upstream from

Fairfax Water's intakes, reveals significant concentrations of PFAS. For example, at Brunswick/Lander, samples of Smallmouth Bass had 7.95 ng/g total PFAS, and their surrounding water tested 17.52 ppt total PFAS in October 2022. At Snyder's Landing above Shepherdstown, West Virginia, water samples registered 17.47 ppt total PFAS in November 2022. Smallmouth Bass tested 6.92 ng/g total PFAS, and Channel Catfish tested 1.91 ng/g at White's Ferry in October 2021, when water samples there had 3.89 ppt total PFAS. At Williamsport, Channel Catfish tissue tested 3.05 ng/g for total PFAS in September 2022.

213. DEQ found widespread PFAS detections in the Occoquan Reservoir Watershed. In DEQ testing locations at Cub Run, Difficult Run near Great Falls, South Run, Broad Run, and Cedar Run, DEQ detected PFOS, PFOA, PFHxS, PFHxA, PFBS, PFBA, PFPeA, as well as other PFAS chemicals. At Cub Run, DEQ detected all of those chemicals except PFOA, and at the Occoquan River sites, DEQ detected PFOS, PFOA, PFDA, PFHpA, PFBS, PFBA, PFNA, PFHxS, PFHxA, PFPeA and 6:2 FTS. At the site called "UT to Cedar Run," DEQ detected PFOA, and in Cedar Run itself DEQ detected PFOS, PFOA, PFPeA, PFHxA, and PFBS.

214. Additional releases of AFFF have likely occurred through testing of equipment and other incidental or accidental releases at these locations and at fire stations and training locations throughout the Fairfax Water service area and watersheds.

215. Upon information and belief, the locations identified in this section as known or likely point-sources of PFAS contamination, collectively housed many gallons of AFFF concentrate manufactured by Defendants, stored in buckets, drums, tankers, tanks, piping and sprinkler systems.

216. Upon information and belief, PFAS-based AFFF was also used at numerous other locations in and near Fairfax Water's service area and in the Potomac River and Occoquan Reservoir watersheds, including at Dulles International Airport,

and other airports, helipads, fire stations, bulk fuel terminals, and industrial facilities.

217. These activities, at the locations identified and others, resulted in discharges or releases of PFAS from Defendants' AFFF products into nearby surface waters, groundwater, soil, and air, as well as water infrastructure and properties owned, operated, and/or maintained by Fairfax Water, including drinking water supplies, reservoirs, holding tanks, and other equipment.

218. In short, the normal, intended, and foreseeable manner of storage, use, and disposal of Defendants' AFFF products directly resulted in the discharge or release of PFAS into, onto, and near Fairfax Water's service area, environmental and infrastructural resources, and other properties, causing injury to them.

219. Upon information and belief, PFAS-based AFFF and/or AFFF component products designed, manufactured, marketed, provided, supplied, sold, and/or distributed by each Defendant were discharged or released into the environment at or from the locations identified above and other sites referenced herein.

220. The instructions, labels and/or material safety data sheets that Defendants provided with their AFFF and/or AFFF component products, if any, during the times relevant to the claims in this Complaint did not fully or sufficiently describe the human and animal health and environmental hazards of PFAS-based AFFF about which Defendants knew or should have known.

221. The instructions, labels and/or material safety data sheets that Defendants provided with their AFFF and/or AFFF component products, if any, during the times relevant to the claims in this Complaint did not provide appropriate warnings and instructions concerning the environmentally safe use and disposal of PFAS-based AFFF that were known or should have been known to Defendants.

222. The instructions, labels and/or material safety data sheets that Defendants provided with their AFFF and/or AFFF component products, if any, during the times relevant to the claims in this Complaint did not provide appropriate instructions

regarding how to design a firefighting testing site, or what precautions are necessary to take at such sites, in a manner that would potentially eliminate or limit the release of PFAS into the environment, even though the hazards of failing to appropriately contain PFAS were known or should have been known to Defendants.

223. For example, instructions to install a liner under a test area where AFFF would be used, or outfitting test-sites with appropriate water filtration systems could have significantly contained the spread of PFAS into the environment. Defendants knew this, but failed to warn or instruct anyone that their products should only be stored, used, and disposed in conjunction with an effective liner or catch basin, or water filtration system capable of removing PFAS before it could contaminate natural resources and water infrastructure.

224. The instructions, labels and/or material safety data sheets that Defendants provided with their AFFF and/or AFFF component products, if any, during the times relevant to the claims in this Complaint did not provide appropriate warnings of potential pollution of groundwater, surface waters, or municipal water systems with PFAS nor advised the AFFF user to install appropriate water filtration devices to protect Fairfax Water's resources and properties, even though Defendants knew or should have known about the inevitability of groundwater, surface water, stormwater, air, soil, infrastructure and equipment contamination through the ordinary and intended use of their PFAS-based AFFF products and consequent adverse effects.

225. As a result, PFAS contamination attributable to the use and disposal of Defendants' PFAS-based AFFF products now afflicts and threatens Fairfax Water's resources and properties.

226. In 2021, VDH tested selected water sources of 45 different water providers in the state, including Fairfax Water's Griffith WTP finished water.

227. Since 2021, Fairfax Water has tested both raw or untreated and finished water from both its Corbalis WTP (intake from the Potomac River) and the Griffith WTP

(intake from Occoquan Reservoir).

228. Fairfax Water continues to monitor for PFAS, to plan, design, and prepare for forthcoming regulatory requirements, and will likely implement advanced technologies to sufficiently address PFAS contamination in its water supplies caused by Defendants' conduct.

229. PFAS contaminants are inevitably also present in the Potomac River and the Occoquan Reservoir watersheds, and in Fairfax Water's water infrastructure, properties, and equipment more broadly, such as treatment plant equipment and conveyance systems.

230. As of April 10, 2024, when the EPA issued its PFAS MCLs, Fairfax Water has known that Defendants have damaged its water sources and properties, likely requiring costly remediation in addition to long-term monitoring and management costs.

231. By that date, Fairfax Water had already incurred significant costs in connection with, among other things, monitoring and analyzing PFAS contamination in Fairfax Water's resources and properties, to determine whether and how it needed to respond to PFAS detections in drinking water supplies, investigating remedial measures and system modifications to reduce PFAS contamination, responding to customer inquiries and educating the public with respect to PFAS impacts in the water supply, and designing, studying, and preparing for implementation of large-scale water quality improvement projects that will address contamination of its water systems. These efforts are ongoing, and in light of the federal MCLs, these efforts are accelerated.

232. Moreover, Fairfax Water's obligations under state and federal environmental regulations to identify, monitor, assess, analyze, and prevent, mitigate, remove, or remediate PFAS contamination of its water infrastructure and other resources and properties, including equipment, have been and are increasingly substantial and impose significant costs on Fairfax Water.

233. PFAS contamination attributable to AFFF threatens the health of the residents and visitors within Fairfax Water's service area, resulting in substantial impairment of public use and enjoyment of resources now burdened with PFAS.

234. Fairfax Water and its retail and wholesale customers have suffered and will continue to suffer significant injuries as a result of Defendants' conduct.

## IV. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### PUBLIC NUISANCE

235. Fairfax Water realleges and reaffirms each and every allegation set forth in paragraphs 1 through 234 as if fully restated in this cause of action.

236. Fairfax Water asserts this cause of action in its governmental capacity to abate a public nuisance which endangers the safety, life and health of the public, including its service population.

237. Defendants designed, manufactured, distributed, marketed, promoted, and sold PFAS-based AFFF products and/or AFFF component products in a manner that created or contributed to the creation or maintenance of a public nuisance that is harmful to health and obstructs the free use of natural resources and Fairfax Water's water and water systems.

238. Defendants designed, manufactured, marketed, distributed, promoted, and sold their PFAS-based AFFF products and/or AFFF component products with knowledge that they inevitably and foreseeably caused environmental contamination when used as intended.

239. Defendants knew or should have known that their PFAS-based AFFF products and/or AFFF component products would inevitably end up in Fairfax Water's water systems, drinking water sources and their watersheds, and in Fairfax Water's infrastructure, equipment, and other resources or properties, when used as intended, including in and around Fairfax Water's service area and its drinking water source

watersheds.

240. Defendants' conduct and the presence of PFAS contamination in Fairfax Water's water systems, source waters and their watersheds, and in its other resources or properties annoys, injures, and endangers the comfort, repose, health, life, and safety of others.

241. Defendants' conduct and the presence of PFAS contamination in Fairfax Water's water systems, source waters and their watersheds, and in its other resources or properties significantly interferes with and obstructs the public's free use and comfortable enjoyment of those resources and properties for drinking water and for other beneficial uses and purposes.

242. Defendants' conduct and the presence of PFAS contamination in Fairfax Water's water systems, source waters and their watersheds, and in its other resources or properties is injurious to human, animal, and environmental health.

243. Defendants' conduct and the presence of PFAS contamination in Fairfax Water's water systems, source waters and their watersheds, and in its other resources or properties interferes with the public's interest in a healthy and ecologically sound environment and the public health.

244. An ordinary person would be reasonably annoyed or disturbed by the presence of toxic PFAS that endanger the health of humans and degrade water quality.

245. The seriousness of the environmental and human health risk far outweighs any social utility of Defendants' conduct in designing, manufacturing, marketing, distributing, promoting, and selling PFAS-based AFFF products and AFFF component products and concealing the dangers posed to human health and the environment.

246. The rights, interests, and inconvenience to Fairfax Water and the people in its service area, and who enjoy use of its watersheds, far outweigh the rights, interests, and inconvenience to Defendants, which have profited heavily from the

manufacture and sale of PFAS-based AFFF products and AFFF component products.

247. Defendants' conduct caused and continues to cause harm to Fairfax Water and persons who rely upon its services.

248. Fairfax Water and the public have suffered and will continue to suffer injury as a result of Defendants' conduct, including deprivation of use and enjoyment of water and water systems impaired or contaminated by PFAS.

249. Defendants knew or should have known that the manufacture, promotion, sale, distribution, and use of their PFAS-based AFFF products and AFFF component products would cause contamination of the natural environment in and near Fairfax Water's service area and its drinking water source watersheds.

250. Defendants knew or should have known that their PFAS-based AFFF and AFFF component products would contaminate Fairfax Water's service area and its drinking water systems, sources and watersheds, degrade freshwater habitats, endanger animals, and contaminate air, soils, sediments, and water infrastructure and equipment in and near Fairfax Water's service area and its drinking water source watersheds.

251. In addition, Defendants knew or should have known that their PFAS-based AFFF products and AFFF component products are associated with serious illnesses and cancers in humans and that humans may be exposed to PFAS through ingestion of contaminated drinking water, fish, meat, or other food, breathing contaminated air, and/or dermal contact. As a result, it was foreseeable to Defendants that the public would be exposed to PFAS attributable to the intended use of their AFFF products and AFFF component products through, e.g., drinking and cooking with contaminated water, bathing or swimming in contaminated waters, watering vegetable gardens with contaminated waters, or eating fish from contaminated areas.

252. Defendants knew, or should have known, that the PFAS contamination they introduced or caused would seriously and unreasonably interfere with the

ordinary comfort, use, and enjoyment of contaminated water sources and supplies, including waters in and near Fairfax Water's service area and its drinking water source watersheds.

253. Defendants' conduct in manufacturing, distributing, marketing, promoting, and selling PFAS-based AFFF products and/or AFFF component products, as well as misrepresenting or omitting the dangers those products foreseeably posed, constitutes an unreasonable interference with a right common to the general public, i.e., the right to safely use Fairfax Water's water systems (including drinking water), and its associated resources and properties, without obstruction and health hazard.

254. As a direct and proximate result of Defendants' creation of a public nuisance, Fairfax Water and the public have suffered, and continue to suffer, significant injuries, including loss of use and enjoyment of Fairfax Water services, water and water systems, and other resources and properties, and injury to the public health.

255. Fairfax Water seeks an order requiring Defendants to abate the nuisance or, in the alternative, to create an abatement fund to be used to abate the public nuisance alleged herein.

## SECOND CAUSE OF ACTION

## PRIVATE NUISANCE

256. Fairfax Water realleges and reaffirms each and every allegation set forth in paragraphs 1 through 234 as if fully restated in this cause of action.

257. Defendants designed, manufactured, distributed, marketed, promoted, and sold PFAS-based AFFF products and/or AFFF component products in a manner that created or contributed to the creation or maintenance of a private nuisance that endangers life and health, and obstructs Fairfax Water's reasonable use and enjoyment of its drinking water infrastructure, equipment, and water sources.

258. Defendants designed, manufactured, marketed, distributed, promoted, and sold their PFAS-based AFFF products and/or AFFF component products with

knowledge that they inevitably and foreseeably caused environmental contamination when used as intended.

259. Defendants knew or should have known that their PFAS-based AFFF products and/or AFFF component products would inevitably end up in Fairfax Water's water systems, drinking water sources and their watersheds, and in Fairfax Water's infrastructure, equipment, and other resources or properties, when used as intended, including in and around Fairfax Water's service area and its drinking water source watersheds.

260. Defendants' conduct and the presence of PFAS contamination in Fairfax Water's water systems, source waters and their watersheds, and in its other resources or properties endangers life and health, and obstructs Fairfax Water's reasonable use and enjoyment of its drinking water infrastructure, equipment, and water sources.

261. Defendants' conduct and the presence of PFAS contamination in Fairfax Water's water systems, source waters and their watersheds, and in its other resources or properties is injurious to human, animal, and environmental health.

262. Defendants' conduct and the presence of PFAS contamination in Fairfax Water's water systems, source waters and their watersheds, and in its other resources or properties interferes with the Fairfax Water's interest in maintaining its properties as healthy and ecologically sound environments which promote the public health.

263. An ordinary person would be reasonably annoyed or disturbed by the presence of toxic PFAS that endanger the health of humans and degrade water quality.

264. The seriousness of the environmental and human health risk far outweighs any social utility of Defendants' conduct in designing, manufacturing, marketing, distributing, promoting, and selling PFAS-based AFFF products and AFFF component products and concealing the dangers posed to human health and the environment.

265. The rights, interests, and inconvenience to Fairfax Water far outweigh the

rights, interests, and inconvenience to Defendants, which have profited heavily from the manufacture and sale of PFAS-based AFFF products and AFFF component products.

266. Defendants' conduct caused and continues to cause harm to Fairfax Water.

267. Fairfax Water has suffered and will continue to suffer injury as a result of Defendants' conduct, including significant deprivation of use and enjoyment of its water and water systems impaired or contaminated by PFAS.

268. Defendants knew or should have known that the manufacture, promotion, sale, distribution, and use of their PFAS-based AFFF products and AFFF component products would cause contamination of Fairfax Water's properties, including its equipment, infrastructure and water sources.

269. Defendants knew or should have known that their PFAS-based AFFF and AFFF component products would contaminate Fairfax Water's drinking water systems and sources, degrade freshwater habitats, endanger animals, and contaminate air, soils, sediments, and water infrastructure and equipment in and near Fairfax Water's service area and its drinking water source watersheds.

270. In addition, Defendants knew or should have known that their PFAS-based AFFF products and AFFF component products are associated with serious illnesses and cancers in humans and that humans may be exposed to PFAS through ingestion of contaminated drinking water, fish, meat, or other food, breathing contaminated air, and/or dermal contact. As a result, it was foreseeable to Defendants that PFAS contamination of Fairfax Water's properties, attributable to the intended use of their AFFF products and AFFF component products, would create obnoxious, annoying, unsafe and unhealthy conditions in those properties, and would interfere with Fairfax Water's use and enjoyment of its properties.

271. Defendants knew, or should have known, that the PFAS contamination

they introduced or caused would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of water sources, including Fairfax Water's drinking water sources and their watersheds.

272. Defendants' conduct in manufacturing, distributing, marketing, promoting, and selling PFAS-based AFFF products and/or AFFF component products, as well as misrepresenting or omitting the dangers those products foreseeably posed, constitutes an unreasonable interference with Fairfax Water's reasonable use and enjoyment of its water systems (including drinking water), and its associated resources and properties, without obstruction and health hazard.

273. As a direct and proximate result of Defendants' creation of a private nuisance, Fairfax Water has suffered, and continues to suffer, significant injuries, including the costs for monitoring, detecting, investigating, and managing PFAS contamination, as well as the costs to design, plan, budget, and eventually to construct, operate and maintain PFAS treatment capacity. Fairfax Water has also incurred costs educating its customers concerning PFAS risks. Its use and enjoyment of its water and water systems to foster public health and safety has been significantly impaired.

274. Fairfax Water has suffered and will continue to suffer damages in amounts to be proven at trial.

## THIRD CAUSE OF ACTION

## DESIGN DEFECT

275. Fairfax Water realleges and reaffirms the allegations set forth in paragraphs 1 through 234 as if fully stated herein.

276. At all relevant times, Defendants were in the business of designing, engineering, manufacturing, developing, marketing, and selling PFAS-based AFFF products and AFFF component products.

277. Defendants' PFAS-based AFFF products and AFFF component products were not reasonably safe as designed at the time the products left Defendants' control.

278. The toxicity, solubility, volatility, persistence, bioaccumulative tendency, and inability of PFAS compounds to be contained rendered Defendants' PFAS-based AFFF products and AFFF component products unreasonably dangerous at all times.

279. Defendants' PFAS-based AFFF products and AFFF component products were unsafe as designed.

280. Due to their toxicity, persistence, volatility, solubility, and inability to be contained, among other things, Defendants knew their PFAS products were not safe at the time they were manufactured because, even when used as intended, such products would inevitably produce significant environmental contamination.

281. Defendants knew or should have known their PFAS-based AFFF products and AFFF component products were unsafe to an extent beyond that which would be contemplated by an ordinary person because of the overwhelming seriousness of creating pervasive environmental contamination of Fairfax Water's drinking water infrastructure and sources, and the Potomac River and Occoquan Reservoir watersheds that feed its drinking water sources.

282. Defendants designed, manufactured, distributed, sold, and promoted PFAS-based AFFF products and AFFF component products despite such knowledge in order to maximize their profits despite the known harm.

283. At all times relevant to this action, feasible alternatives to PFAS-based AFFF products were available to Defendants, which could have eliminated, reduced, or mitigated the unreasonable dangers and hazards posed by the AFFF products as designed.

284. Any utility allegedly provided by the use of PFAS-based AFFF products and AFFF component products is greatly outweighed by the risks and dangers associated with their use.

285. The PFAS-based AFFF products and AFFF component products were placed in the stream of commerce and sold by Defendants in a defective and

unreasonably dangerous condition in that they were toxic, persistent, bioaccumulative, water- and fat-soluble, and volatile or semi-volatile (i.e., inevitably escaping their ordinary and intended applications), which resulted in contamination of Fairfax Water's drinking water infrastructure and sources, and the Potomac River and Occoquan Reservoir watersheds that feed its drinking water sources.

286. The PFAS compounds released from Defendants' AFFF products reached Fairfax Water's drinking water infrastructure and sources, and the Potomac River and Occoquan Reservoir watersheds that feed its drinking water sources, without any substantial change in condition and were in the same condition at the time of the alleged injury to Fairfax Water's drinking water infrastructure and sources, and the Potomac River and Occoquan Reservoir watersheds that feed its drinking water sources.

287. It was foreseeable to Defendants or a reasonable manufacturer that the PFAS would reach Fairfax Water's drinking water infrastructure and sources, and the Potomac River and Occoquan Reservoir watersheds that feed its drinking water sources.

288. Contamination of Fairfax Water's drinking water infrastructure and sources, and the Potomac River and Occoquan Reservoir watersheds that feed its drinking water sources, occurred because of the defective design and manufacture of the PFAS-based AFFF products and AFFF component products.

289. Defendants' PFAS-based AFFF products and AFFF component products caused and continue to cause injury to Fairfax Water.

290. Defendants are under a continuing duty to act to correct and remediate the injuries their conduct has introduced, and to warn Fairfax Water and the public about the human and environmental risks posed by its PFAS products, and each day on which they fail to do so constitutes a new and ongoing injury to Fairfax Water.

291. Fairfax Water has suffered and will continue to suffer damages in amounts to be proven at trial.

292. Defendants are strictly liable for all damages arising out of their defectively designed PFAS-based AFFF products and AFFF component products.

## FOURTH CAUSE OF ACTION

## FAILURE TO WARN

293. Fairfax Water realleges and reaffirms the allegations set forth in paragraphs 1 through 234 as if fully stated herein.

294. At all relevant times, Defendants were in the business of designing, engineering, manufacturing, developing, marketing, and selling PFAS-based AFFF products and AFFF component products.

295. Defendants' PFAS-based AFFF products and AFFF component products were not reasonably safe because they lacked adequate warnings at the time the products left Defendants' control.

296. At the time Defendants designed, manufactured, distributed, sold, and promoted their PFAS-based AFFF products and AFFF component products, Defendants knew or should have known that, even when used as intended, such products would inevitably and foreseeably produce significant environmental contamination.

297. Despite Defendants' knowledge, Defendants failed to provide adequate warnings that their PFAS-based AFFF products and AFFF component products would become a pervasive contaminant and contaminate drinking water infrastructure and sources, and source water watersheds, including those of Fairfax Water.

298. Defendants could have warned of this certainty but intentionally concealed the certainty of contamination and pollution in order to maximize profits.

299. Defendants concealed the dangers of PFAS and PFAS-based products after they designed, manufactured, distributed, promoted, and sold them, and did not issue adequate warnings or instructions to those who had previously purchased their products, and thereafter continued to design, manufacture, distribute, promote, and sell

PFAS-based products without adequate warnings or instructions.

300. Without adequate warnings or instructions, Defendants' PFAS-based AFFF products and AFFF component products were unsafe to an extent beyond that which would be contemplated by an ordinary person.

301. Defendants knowingly failed to issue warnings or instructions concerning the dangers of PFAS and their PFAS-based products in the manner that a reasonably prudent manufacturer would act in the same or similar circumstances.

302. The PFAS-based AFFF products and AFFF component products were placed in the stream of commerce and sold by Defendants in a defective and unreasonably dangerous condition in that their design failed to include warnings or instructions sufficient and necessary for the safe and proper use and disposal of the products.

303. The PFAS compounds released from Defendants' AFFF products reached Fairfax Water's drinking water infrastructure and sources, and the Potomac River and Occoquan Reservoir watersheds that feed its drinking water sources, without any substantial change in condition and were in the same condition at the time of the alleged injury to Fairfax Water's drinking water infrastructure and sources, and the Potomac River and Occoquan Reservoir watersheds that feed its drinking water sources.

304. It was foreseeable to Defendants or a reasonable manufacturer that the PFAS would reach Fairfax Water's drinking water infrastructure and sources, and the Potomac River and Occoquan Reservoir watersheds that feed its drinking water sources.

305. Contamination of Fairfax Water's drinking water infrastructure and sources, and the Potomac River and Occoquan Reservoir watersheds that feed its drinking water sources, occurred because of the defective PFAS-based AFFF products and AFFF component products, in that to be non-defective and reasonably safe for use, the products should have contained or been accompanied by a warning as to their

toxicity, persistence, bioaccumulativity, solubility and volatility.

306. Further, such contamination occurred because of Defendants' failure to adequately warn or instruct their customers as to proper disposal techniques and safeguards necessary to prevent environmental contamination resulting from the ordinary use of such products.

307. Defendants' PFAS-based AFFF products and AFFF component products caused and continue to cause injury to Fairfax Water.

308. Defendants are under a continuing duty to act to correct and remediate the injuries their conduct has introduced, and to warn Fairfax Water and the public about the human and environmental risks posed by its products, and each day on which they fail to do so constitutes a new and ongoing injury to Fairfax Water.

309. Fairfax Water has suffered and will continue to suffer damages in amounts to be proven at trial.

310. Defendants are strictly liable for all damages arising out of their failure to provide adequate warnings and instructions.

## FIFTH CAUSE OF ACTION

## TRESPASS

311. Fairfax Water realleges and reaffirms the allegations set forth in paragraphs 1 through 234 as if fully stated herein.

312. As alleged above, Defendants designed, manufactured, distributed, marketed, and promoted PFAS-based AFFF products and AFFF component products in a manner that ensured that PFAS compounds would invade Fairfax Water's drinking water infrastructure and sources, and the Potomac River and Occoquan Reservoir watersheds that feed its drinking water sources.

313. As a result of such invasion, Fairfax Water's drinking water infrastructure and sources, and the Potomac River and Occoquan Reservoir watersheds that feed its drinking water sources, suffer contamination with toxic PFAS.

314. Defendants knew that it was a substantial certainty that PFAS would end up in Fairfax Water's drinking water infrastructure and sources, and the Potomac River and Occoquan Reservoir watersheds that feed its drinking water sources, when Defendants' products were used as intended, including in and near Fairfax Water's service area and its source water watersheds.

315. Defendants acted intentionally while knowing, or having reason to know, that Defendants did not have authorization to act in a manner that would cause injury to Fairfax Water's drinking water infrastructure and sources, and the Potomac River and Occoquan Reservoir watersheds that feed its drinking water sources.

316. Defendants' conduct caused and will continue to cause injury to Fairfax Water.

317. Defendants are under a continuing duty to act to correct and remediate the injuries their conduct has caused, and each day on which they fail to do so constitutes a new and ongoing injury to Fairfax Water.

318. As a direct and proximate result of Defendants' trespass, Fairfax Water has suffered, and continues to suffer, monetary damages to be proven at trial.

## SIXTH CAUSE OF ACTION

## NEGLIGENCE

319. Fairfax Water realleges and reaffirms the allegations set forth in paragraphs 1 through 234 as if fully stated herein.

320. Defendants had a duty of care to protect others against unreasonable risks resulting from the ordinary use or disposal of their PFAS-based AFFF products and AFFF component products.

321. Defendants breached their duty by failing to conform to the requisite standard of care when they negligently, carelessly, and recklessly designed, manufactured, formulated, handled, stored, labeled, instructed, controlled (or failed to control), tested (or failed to test), marketed, sold, and otherwise distributed toxic PFAS-

based products that contaminated Fairfax Water's drinking water infrastructure and sources, and the Potomac River and Occoquan Reservoir watersheds that feed its drinking water sources.

322. Defendants failed to exercise ordinary care because a reasonably careful company that learned of its product's toxicity would not manufacture that product or would warn of its properties.

323. Defendants failed to exercise ordinary care because a reasonably careful company that learned that its product could not be contained during normal production and use would not continue to manufacture that product or would warn of its dangers.

324. Defendants failed to exercise ordinary care because a reasonably careful company would not continue to manufacture and market or promote PFAS-based AFFF products in mass quantities and to the extent that Defendants manufactured, marketed, and promoted them.

325. There is a proximate causal connection between Defendants' breach of their duty of care and the resulting harm to Fairfax Water's drinking water infrastructure and sources, and the Potomac River and Occoquan Reservoir watersheds that feed its drinking water sources.

326. Defendants' negligence caused and continues to cause injury to Fairfax Water.

327. Defendants are under a continuing duty to act to correct and remediate the injuries their conduct has introduced, and to warn Fairfax Water and the public about the human and environmental risks posed by their products, and each day on which they fail to do so constitutes a new and ongoing injury to Fairfax Water.

328. Fairfax Water has suffered and will continue to suffer damages in amounts to be proven at trial.

**SEVENTH CAUSE OF ACTION**

**TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY**

329. Fairfax Water realleges and reaffirms the allegations set forth in paragraphs 1 through 234 as if fully stated herein.

330. Fairfax Water is a public, not for profit corporation, in the business of providing safe, healthy drinking water to millions of people.

331. Fairfax Water has long term contracts to provide wholesale water to numerous jurisdictions, and it has retail consumer contractual relationships with residential and business accounts within its primary drinking water service area.

332. Fairfax Water's business depends upon the purity, safety and healthfulness of its water sources, the Potomac River and the Occoquan Reservoir, as well as its reputation for providing safe, clean drinking water.

333. Fairfax Water holds the reasonable business expectancy that its water sources will not be contaminated with chemicals that are toxic to humans.

334. Defendants knew or should have known that when used as intended within Fairfax Waters watersheds, PFAS-based AFFF products would contaminate Fairfax Water's water sources with PFAS chemicals that are toxic to humans.

335. Defendants knew or should have known that their PFAS-based AFFF products and/or AFFF component products would inevitably end up in Fairfax Water's water systems, drinking water sources and their watersheds, and in Fairfax Water's infrastructure, equipment, and other resources or properties, when used as intended, including in and around Fairfax Water's service area and its drinking water source watersheds.

336. Instead of warning of the dangers of PFAS contamination from their products, or developing measures to protect against contamination, or alternative products that would not contaminate Fairfax Water's water infrastructure and water sources, Defendants willfully and maliciously hid their knowledge and/or worked to prevent the public, government regulators, or Fairfax Water from learning about the

dangers of their PFAS-based AFFF products.

337. Defendants' PFAS-based AFFF products were used at the sites enumerated in this Complaint, and at additional sites to be discovered within Fairfax Water's watersheds, with the foreseeable result that Fairfax Water's source waters became contaminated with PFAS, requiring long-term monitoring and likely expensive treatment to protect its ability to provide, and reputation for providing, clean, safe water to its customers, its public business mission to safeguard the health and welfare of its customers, and its ongoing business relationships with its water customers.

338. As the public, governmental regulators, and Fairfax Water have become aware of the dangers of PFAS, Fairfax Water has incurred costs to monitor for and plan to remediate PFAS contamination, and to educate and reassure its customer base that it is taking all needed measures to protect their health, and the health of the watershed more generally.

339. Defendants' willful, malicious and foreseeable contamination of Fairfax Water's water sources and infrastructure has interfered with Fairfax Water's reasonable business expectancy.

340. Fairfax Water has suffered and will continue to suffer damages in amounts to be proven at trial.

## SEVENTH CAUSE OF ACTION

## CIVIL CONSPIRACY (COMMON LAW)

341. Fairfax Water realleges and reaffirms the allegations set forth in paragraphs 1 through 234 as if fully stated herein.

342. Defendants combined and collaborated with one another to disregard their own scientists' findings and warnings, and to more generally prevent the development of scientific knowledge and public understanding, that PFAS chemicals are both highly mobile once they are used as intended (including being sprayed into air and onto the ground in AFFF formulations), and that they would enter and persist

within water supplies, including those of Fairfax Water.

343. Defendants combined and collaborated with one another to intentionally, purposely, and without legal justification suppress knowledge that PFAS are toxic to humans and when used as intended would contaminate drinking water supplies including Fairfax Water's resources and properties. Defendants willfully and maliciously combined and conspired to suppress the known dangers of PFAS in order to continue selling their PFAS-based AFFF products and component products without adequate warnings despite their known dangers.

344. By way of example, 3M has known since the 1970s that PFOS was detectable in human blood serum, likely posed a cancer risk, and had obviously spread beyond the immediate site of its applications and was bioaccumulating. 3M never published its toxicity studies and worked actively and willfully to stifle research on the adverse effects of PFAS, including PFOA and PFOS.

345. Likewise, for decades Dupont hid and suppressed knowledge of the dangers of PFAS, and made knowingly, willful and malicious false and misleading statements to the media, including that: "[i]n more than 50 years of [PFOA] use by [DuPont] and others, there have been no known adverse human health effects associated with the chemical," that "all" of the available scientific research "has been provided to both state and federal regulators," that "epidemiological studies of workers do not indicate an increased risk of cancer associated with exposure to [PFOA]," that "[DuPont] has made significant efforts to respond to the public honestly and openly with correct information about [PFOA]."

346. UTC, now known as RTX, and other FFFC members further knew that in 2008 the FFFC falsely told the federal government that UTC's telomer-based AFFF did not contain C8 surfactants.

347. Upon information and belief, the remaining Defendants also knew, or should have known, that in their intended and common use, PFAS-based AFFF and/or

AFFF component products would injure and/or threaten the environment and public health, including by contaminating public water systems like that of Fairfax Water. This information was accessible to each of them, including as part of their ongoing involvement in various trade associations constituted for the purpose of defending the AFFF market, including the FFFC.

348. As a result of Defendants' combined actions to produce and market PFAS-based AFFF products and their PFAS component products without adequate warnings and despite their known dangers, and to suppress knowledge and understanding of the dangers of PFAS and the development of safer alternative products, actions taken in furtherance of their conspiracy, Fairfax Water has suffered and will continue to suffer injury.

349. As a result of Defendants' combined actions, Fairfax Water's water sources and infrastructure have been damaged, and it has had to bear the costs and will continue to bear the costs of monitoring, remediating and planning future PFAS remediation in order to prevent the public from being exposed to hazardous concentrations of PFAS chemicals. Fairfax Water has thus suffered costly damage to its business operations and expectancy.

350. As Fairfax Water, regulators, and the public have become aware of the dangers of PFAS, Fairfax Water has suffered costs to preserve and repair its reputation with its water customers and the general public. As the science concerning the dangers of PFAS has finally been developed and come to light, and as advocacy groups have focused public attention on PFAS contamination of water sources throughout the U.S. and in Northern Virginia, Fairfax Water has had to bear the costs and will continue to bear the costs, of educating customers about its PFAS monitoring and remediation measures to safeguard the water it distributes, and responding to customer concerns about potential PFAS contamination. Fairfax Water has thus suffered costly damage to its reputation.

351. Defendants thus conspired together to commit the torts of public nuisance, trespass, design defect, failure to warn, negligence and/or tortious interference with business expectations, and caused injury to Fairfax Water.

## EIGHTH CAUSE OF ACTION

## CIVIL CONSPIRACY (Va. Code Ann. §§ 18.2-499, 18.2-500)

352. Fairfax Water realleges and reaffirms the allegations set forth in paragraphs 1 through 234 as if fully stated herein.

353. Fairfax Water is a not for profit municipal corporation formed for the purpose of providing safe, clean drinking water to millions of people in Northern Virginia. Fairfax Water holds contracts to provide wholesale water service to several neighboring water provider entities. It also has retail service contracts to provide clean, safe water to over one million people.

354. The business of providing safe, clean drinking water to the public is highly dependent on the provider's reputation for high standards of water purity, and is highly dependent on public confidence.

355. Defendants combined and collaborated with one another willfully and maliciously to disregard their own scientists' findings and warnings, and to more generally prevent the development of scientific knowledge and public understanding, that PFAS chemicals were both highly mobile once they were used as intended (including being sprayed in air and onto the ground in AFFF formulations), and that they would enter and persist within water supplies, including those of Fairfax Water.

356. Defendants combined and collaborated with one another and acted willfully and with legal malice (i.e. intentionally, purposely, and without legal justification), to suppress the knowledge that PFAS are toxic to humans and when used as intended would contaminate drinking water supplies, including Fairfax Water's water supplies, and to continue selling their PFAS-based AFFF products and component products without adequate warnings and despite their known dangers.

357. By way of example, 3M has known since the 1970s that PFOS was detectable in human blood serum, likely posed a cancer risk, and had obviously spread beyond the immediate site of its applications and was bioaccumulating. 3M never published its toxicity studies and worked actively to stifle research on the adverse effects of PFAS, including PFOA and PFOS.

358. Likewise, for decades Dupont willfully and maliciously hid and suppressed knowledge of the dangers of PFAS, and made knowingly false and misleading statements to the media, including that: "[i]n more than 50 years of [PFOA] use by [DuPont] and others, there have been no known adverse human health effects associated with the chemical," that "all" of the available scientific research "has been provided to both state and federal regulators," that "epidemiological studies of workers do not indicate an increased risk of cancer associated with exposure to [PFOA]," that "[DuPont] has made significant efforts to respond to the public honestly and openly with correct information about [PFOA]."

359. UTC, now known as RTX, and other FFFC members further knew that in 2008 the FFFC falsely told the federal government that UTC's telomer-based AFFF did not contain C8 surfactants.

360. Upon information and belief, the remaining Defendants also knew, or should have known, that in its intended and common use, PFAS-based AFFF and/or AFFF component products would injure and/or threaten the environment, public water supplies, including Fairfax Water's water supplies, as well as endangering the public health. This information was accessible to each of them, including as part of their ongoing involvement in various trade associations constituted for the purpose of defending the AFFF market, including the FFFC.

361. As a result of Defendants' combined actions to produce and market PFAS-based AFFF products and their PFAS component products without adequate warnings and despite their known dangers, and to suppress knowledge and understanding of the

dangers of PFAS, actions taken in furtherance of their conspiracy, Fairfax Water has suffered and will continue to suffer injury.

362. As a result of Defendants' combined actions, Fairfax Water's water sources and infrastructure have been damaged, it has had to bear the costs and will continue to bear the costs of monitoring, remediating and planning future PFAS remediation in order to comply with tightening government regulations and prevent the public from being exposed to hazardous concentrations of PFAS chemicals. Fairfax Water has thus suffered costly damage to its business operations and expectancy.

363. As Fairfax Water, regulators, and the public have become aware of the dangers of PFAS, Fairfax Water has suffered costs to preserve and repair its reputation with its water customers and the general public. As the science concerning the dangers of PFAS has finally been developed and come to light, and as advocacy groups have focused public attention on PFAS contamination of water sources throughout the U.S. and in Northern Virginia, Fairfax Water has had to bear the costs and will continue to bear the costs, of educating customers about its PFAS monitoring and remediation measures to safeguard the water it distributes, and responding to customer concerns about potential PFAS contamination. Fairfax Water has thus suffered costly damage to its reputation.

364. Defendants thus conspired together to commit the torts of public nuisance, trespass, design defect, failure to warn, negligence and/or tortious interference with business expectations, and caused injury to Fairfax Water.

## VI. JURY TRIAL DEMAND

Plaintiff respectfully requests trial by jury on all claims so triable.

## VII. PRAYER FOR RELIEF

Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

A. An order requiring Defendants to abate the public nuisance created or maintained by their conduct, or to which their conduct contributed, or alternatively, to establish an abatement fund to abate the public nuisance;

B. Damages to Fairfax Water according to proof, including all past, current, and future costs to monitor, assess, analyze, control, reduce, and/or eliminate PFAS contamination of its drinking water infrastructure, equipment, and water sources and supplies, to educate the public and repair public confidence in the purity of Fairfax Water's drinking water, and to protect the public health;

C. Any other damages, including treble damages and punitive and exemplary damages;

D. Total damages in the amount of three billion dollars, not inclusive of treble, punitive, or exemplary damages;

E. Litigation costs and attorneys' fees as permitted by law;

F. Pre-judgment and post-judgment interest on all monies awarded, as permitted by law; and

G. Such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated: January 10, 2025

FAIRFAX COUNTY WATER AUTHORITY

By:______________________________

KYLE J. MCGEE (Pro hac vice forthcoming)
VIOLA VETTER (Pro hac vice forthcoming)
SUZANNE SANGREE (Pro hac vice forthcoming)
JASON H. WILSON (Pro hac vice forthcoming)
CALEY DEGROOTE (Va. Bar No. 92197)
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, DE 19801
Tel.: (302) 622-7000
Fax: (302) 622-7100
kmcgee@gelaw.com

vvetter@gelaw.com
ssangree@gelaw.com
jwilson@gelaw.com
cdegroote@gelaw.com

*Attorneys for Plaintiffs*

**COVER SHEET FOR FILING CIVIL ACTIONS** Case No. ............................

COMMONWEALTH OF VIRGINIA (CLERK'S OFFICE USE ONLY)

THE COUNTY OF FAIRFAX Circuit Court

FAIRFAX COUNTY WATER AUTHORITY v./*In re:* 3M Co., et al.

PLAINTIFF(S) DEFENDANT(S)

I, the undersigned [ ] plaintiff [ ] defendant [X] attorney for [X] plaintiff [ ] defendant hereby notify the Clerk of Court that I am filing the following civil action. (Please indicate by checking box that most closely identifies the claim being asserted or relief sought.)

**GENERAL CIVIL**

**Subsequent Actions**

- [ ] Claim Impleading Third Party Defendant
  - [ ] Monetary Damages
  - [ ] No Monetary Damages
- [ ] Counterclaim
  - [ ] Monetary Damages
  - [ ] No Monetary Damages
- [ ] Cross Claim
- [ ] Interpleader
- [ ] Reinstatement (other than divorce or driving privileges)
- [ ] Removal of Case to Federal Court

**Business & Contract**

- [ ] Attachment
- [ ] Confessed Judgment
- [ ] Contract Action
- [ ] Contract Specific Performance
- [ ] Detinue
- [ ] Garnishment

**Property**

- [ ] Annexation
- [ ] Condemnation
- [ ] Ejectment
- [ ] Encumber/Sell Real Estate
- [ ] Enforce Vendor's Lien
- [ ] Escheatment
- [ ] Establish Boundaries
- [ ] Landlord/Tenant
  - [ ] Unlawful Detainer
- [ ] Mechanics Lien
- [ ] Partition
- [ ] Quiet Title
- [ ] Termination of Mineral Rights

**Tort**

- [ ] Asbestos Litigation
- [ ] Compromise Settlement
- [ ] Intentional Tort
- [ ] Medical Malpractice
- [ ] Motor Vehicle Tort
- [X] Product Liability
- [ ] Wrongful Death
- [ ] Other General Tort Liability

**ADMINISTRATIVE LAW**

- [ ] Appeal/Judicial Review of Decision of (select one)
  - [ ] ABC Board
  - [ ] Board of Zoning
  - [ ] Compensation Board
  - [ ] DMV License Suspension
  - [ ] Employee Grievance Decision
  - [ ] Employment Commission
  - [ ] Local Government
  - [ ] Marine Resources Commission
  - [ ] School Board
  - [ ] Voter Registration
  - [ ] Other Administrative Appeal

**DOMESTIC/FAMILY**

- [ ] Adoption
  - [ ] Adoption – Foreign
- [ ] Adult Protection
- [ ] Annulment
  - [ ] Annulment – Counterclaim/Responsive Pleading
- [ ] Child Abuse and Neglect – Unfounded Complaint
- [ ] Civil Contempt
- [ ] Divorce (select one)
  - [ ] Complaint – Contested*
  - [ ] Complaint – Uncontested*
  - [ ] Counterclaim/Responsive Pleading
  - [ ] Reinstatement – Custody/Visitation/Support/Equitable Distribution
- [ ] Separate Maintenance
  - [ ] Separate Maintenance Counterclaim

**WRITS**

- [ ] Certiorari
- [ ] Habeas Corpus
- [ ] Mandamus
- [ ] Prohibition
- [ ] Quo Warranto

**PROBATE/WILLS AND TRUSTS**

- [ ] Accounting
- [ ] Aid and Guidance
- [ ] Appointment (select one)
  - [ ] Guardian/Conservator
  - [ ] Standby Guardian/Conservator
  - [ ] Custodian/Successor Custodian (UTMA)
- [ ] Trust (select one)
  - [ ] Impress/Declare/Create
  - [ ] Reformation
- [ ] Will (select one)
  - [ ] Construe
  - [ ] Contested

**MISCELLANEOUS**

- [ ] Amend Birth/Death Certificate
- [ ] Appointment (select one)
  - [ ] Church Trustee
  - [ ] Conservator of Peace
  - [ ] Marriage Celebrant
- [ ] Approval of Transfer of Structured Settlement
- [ ] Bond Forfeiture Appeal
- [ ] Declaratory Judgment
- [ ] Declare Death
- [ ] Driving Privileges (select one)
  - [ ] Reinstatement pursuant to § 46.2-427
  - [ ] Restoration – Habitual Offender or 3rd Offense
- [ ] Expungement
- [ ] Firearms Rights – Restoration
- [ ] Forfeiture of Property or Money
- [ ] Freedom of Information
- [ ] Injunction
- [ ] Interdiction
- [ ] Interrogatory
- [ ] Judgment Lien-Bill to Enforce
- [ ] Law Enforcement/Public Official Petition
- [ ] Name Change
- [ ] Referendum Elections
- [ ] Sever Order
- [ ] Taxes (select one)
  - [ ] Correct Erroneous State/Local
  - [ ] Delinquent
- [ ] Vehicle Confiscation
- [ ] Voting Rights – Restoration
- [ ] Other (please specify) ............................

[X] Damages in the amount of $ $3,000,000,000 are claimed.

1/10/2025 /s/ Caley DeGroote (VA Bar No. 92197)

DATE [X] PLAINTIFF [ ] DEFENDANT [ ] ATTORNEY FOR [ ] PLAINTIFF [ ] DEFENDANT

Caley DeGroote

PRINT NAME

123 Justison Street, Wilmington, DE 19801/(302) 622-7035

ADDRESS/TELEPHONE NUMBER OF SIGNATOR

cdegroote@gelaw.com

EMAIL ADDRESS OF SIGNATOR (OPTIONAL)

*"Contested" divorce means any of the following matters are in dispute: grounds of divorce, spousal support and maintenance, child custody and/or visitation, child support, property distribution or debt allocation. An "Uncontested" divorce is filed on no fault grounds and none of the above issues are in dispute.

# Civil Action Type Codes
## (Clerk's Office Use Only)

Accounting ........ ACCT
Adoption ........ ADOP
Adoption – Foreign ........ FORA
Adult Protection ........ PROT
Aid and Guidance ........ AID
Amend Birth/Death Certificate ........ AVR
Annexation ........ ANEX
Annulment ........ ANUL
Annulment – Counterclaim/Responsive Pleading .. ACRP
Appeal/Judicial Review
- ABC Board ........ ABC
- Board of Zoning ........ ZONE
- Compensation Board ........ ACOM
- DMV License Suspension ........ JR
- Employment Commission ........ EMP
- Employment Grievance Decision ........ GRV
- Local Government ........ GOVT
- Marine Resources ........ MAR
- School Board ........ JR
- Voter Registration ........ AVOT
- Other Administrative Appeal ........ AAPL

Appointment
- Conservator of Peace ........ COP
- Church Trustee ........ AOCT
- Custodian/Successor Custodian (UTMA) ...... UTMA
- Guardian/Conservator ........ APPT
- Marriage Celebrant ........ ROMC

Approval of Transfer of Structured Settlement ........ SS
Asbestos Litigation ........ AL
Attachment ........ ATT
Bond Forfeiture Appeal ........ BFA
Child Abuse and Neglect – Unfounded Complaint .. CAN
Civil Contempt ........ CCON
Claim Impleading Third Party Defendant – Monetary Damages/No Monetary Damages ........ CTP
Complaint – (Miscellaneous) ........ COM
Compromise Settlement ........ COMP
Condemnation ........ COND
Confessed Judgment ........ CJ
Contract Action ........ CNTR
Contract Specific Performance ........ PERF
Counterclaim – Monetary Damages/No Monetary Damages ........ CC
Cross Claim ........ CROS
Declaratory Judgment ........ DECL
Declare Death ........ DDTH
Detinue ........ DET
Divorce
- Complaint – Contested/Uncontested ........ DIV
- Counterclaim/Responsive Pleading ........ DCRP
- Reinstatement – Custody/Visitation/Support/ Equitable Distribution ........ CVS

Driving Privileges
- Reinstatement pursuant to § 46.2-427 ........ DRIV
- Restoration – 3rd Offense ........ REST

Ejectment ........ EJET
Encumber/Sell Real Estate ........ RE
Enforce Vendor's Lien ........ VEND
Escheatment ........ ESC
Establish Boundaries ........ ESTB
Expungement ........ XPUN
Forfeiture of Property or Money ........ FORF
Freedom of Information ........ FOI
Garnishment ........ GARN
Injunction ........ INJ
Intentional Tort ........ ITOR
Interdiction ........ INTD
Interpleader ........ INTP
Interrogatory ........ INTR
Judgment Lien – Bill to Enforce ........ LIEN
Landlord/Tenant ........ LT
Law Enforcement/Public Official Petition ........ LEP
Mechanics Lien ........ MECH
Medical Malpractice ........ MED
Motor Vehicle Tort ........ MV
Name Change ........ NC
Other General Tort Liability ........ GTOR
Partition ........ PART
Permit, Unconstitutional Grant/Denial by Locality LUC
Petition – (Miscellaneous) ........ PET
Product Liability ........ PROD
Quiet Title ........ QT
Referendum Elections ........ ELEC
Reinstatement (Other than divorce or driving privileges) ........ REIN
Removal of Case to Federal Court ........ REM
Restore Firearms Rights – Felony ........ RFRF
Restore Firearms Rights – Review ........ RFRR
Separate Maintenance ........ SEP
Separate Maintenance – Counterclaim/Responsive Pleading ........ SCRP
Sever Order ........ SEVR
Sex Change ........ COS
Taxes
- Correct Erroneous State/Local ........ CTAX
- Delinquent ........ DTAX

Termination of Mineral Rights ........ MIN
Trust – Impress/Declare/Create ........ TRST
Trust – Reformation ........ REFT
Uniform Foreign Country Money Judgments ........ RFCJ
Unlawful Detainer ........ UD
Vehicle Confiscation ........ VEH
Violation – Election Law ........ VEL
Voting Rights – Restoration ........ VOTE
Will Construction ........ CNST
Will Contested ........ WILL
Writs
- Certiorari ........ WC
- Habeas Corpus ........ WHC
- Mandamus ........ WM
- Prohibition ........ WP
- Quo Warranto ........ WQW

Wrongful Death ........ WD